# NICOL *v.* AMES.

NO. 435. APPEAL FROM THE CIRCUIT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS.

173  509
L.-ed  786
f178  82

# *In re* NICHOLS.

NO. 4. ORIGINAL.

# SKILLEN *v.* AMES.

NO. 625. APPEAL FROM THE CIRCUIT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS.

# INGWERSEN *v.* UNITED STATES.

NO. 636. ERROR TO THE DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS.

Nos. 435 and 4 Original argued, and Nos. 625 and 636 submitted, December 13, 1898. — Decided April 3, 1899.

When an act of Congress is claimed to be unconstitutional, the presumption is in favor of its validity, and it is only when the question is free from any reasonable doubt that this court should hold an act of the law-making power of the nation to be in violation of that fundamental instrument upon which all the powers of the Government rest.

The tax authorized by the act of June 13, 1898, by the board of trade or exchanges upon the sale of property is not a direct tax, nor a tax upon the business itself which is so transacted, but is a duty upon the facilities made use of and actually employed in the transaction of the business, separate and apart from the business itself, and is a constitutional exercise of the powers of taxation granted to Congress.

A sale at an exchange forms a proper basis for a classification which excludes all sales made elsewhere from taxation.

The means actually adopted by Congress, in the act in question, do not illegally interfere with or obstruct the internal commerce of the States, and are not a restraint upon that commerce, so far as to render illegal the means adopted.

There is no difference, for the purposes of this decision, between the Union Stock Yards and an exchange or board of trade.

These cases involve the validity and construction of some of the provisions of section 6, and a portion of schedule "A," therein referred to, of the act of Congress approved June 13, 1898, c. 448, 30 Stat., entitled "An act to provide ways and means to meet war expenditures, and for other purposes," commonly spoken of as the War Revenue Act. The cases come before the court in this way :

No. 435 is an appeal to this court from an order made by the Circuit Court of the United States for the Northern District of Illinois, discharging a writ of *habeas corpus* and remanding the petitioner to the custody of the marshal. The petition to the Circuit Court for the writ alleged that the petitioner Nicol had been convicted in the United States court for the Northern District of Illinois, upon an information duly filed charging him with selling, at the Chicago Board of Trade and at its rooms, two carloads of oats, " without then and there making and delivering to the buyer any bill, memorandum, agreement or other evidence of said sale, showing the date thereof, the name of the seller, the amount of the same and the matter or thing to which it referred, as required by the act of Congress," above mentioned. He was sentenced to pay a fine and to be imprisoned until paid. He refused to pay, and was taken into custody by the marshal. That part of the act referring to the making and delivering of a bill or memorandum, etc., the petitioner claimed was unconstitutional. The Circuit Court, after argument, held the law valid and the conviction legal.

No. 4 Original is an application to this court for leave to file a petition for a writ of *habeas corpus* to bring before the court the petitioner George R. Nichols, and for a rule requiring the marshal for the Northern District of Illinois, in whose custody the petitioner is, to show cause why the writ should not issue. The petition states that Nichols was convicted and sentenced, under the act of Congress above mentioned, upon an information filed in the District Court of the United States for the Northern District of Illinois, for selling at the Chicago Board of Trade, of which he was then a member, for immediate delivery to one Roloson, also a member of such board,

ten tierces, or three thousand pounds of hams, then in Chicago, at a price named, amounting to $195, and on the sale unlawfully making and delivering to Roloson a bill and memorandum of the sale showing the date thereof, the name of the seller, the amount of the same and the matters and things to which it referred, without having the proper stamps affixed to said bill or memorandum denoting the internal revenue accruing upon said sale, bill or memorandum, as required by law, but on the contrary unlawfully refusing and neglecting to affix any such stamps to said bill or memorandum. Upon the trial the jury rendered a verdict finding the petitioner guilty as charged in the information, and the court sentenced him to pay a fine of $500 and to be committed to the county jail until such fine and costs should be paid. The petitioner refused to pay the fine and an order of commitment was made out and placed in the hands of the marshal, who arrested the petitioner and he is now in the custody of the marshal. The petitioner upon the trial claimed that the act in regard to the matters named in the information was unconstitutional, and therefore no offence was charged in the information; that the court had no jurisdiction to try him, and that his conviction and subsequent arrest and detention were wholly without jurisdiction. The petitioner gives as a reason for his application to this court for the writ of *habeas corpus* that one James Nicol (the appellant in No. 435) had been convicted of substantially the same offence in the District Court for the Northern District of Illinois, and that he had made application for a writ of *habeas corpus* to the Circuit Court held in that district, which court, after a hearing upon the writ, decided against Nicol and in favor of the constitutionality of the act of Congress herein questioned, and the petitioner herein alleges that it would be a vain act to apply for a writ of *habeas corpus* to the same Circuit Court which had already, after a hearing, decided the question in a way unfavorable to the claims of the petitioner herein.

No. 625 is also an appeal to this court from an order of the Circuit Court of the United States for the Northern District of Illinois, discharging a writ of *habeas corpus* and remand-

ing the petitioner Skillen to the custody of the marshal. The petitioner was convicted upon an information of the same nature as is above set forth in No. 435, excepting that the information in this case alleged that the contract was for future delivery of 5000 bushels of corn, and that Skillen unlawfully failed and refused to make and deliver to the buyer any bill or memorandum as required by the act. The petitioner was convicted upon a trial had upon such information, and the court imposed upon him a fine in the sum of $500 besides costs, and directed that he should be committed to the county jail until such fine and costs were paid. The same proceedings were then taken as are set forth in No. 435.

No. 636 is a writ of error to the District Court of the United States for the Northern District of Illinois, to review a conviction of the plaintiff in error upon an information charging him with making a sale of certain cattle at the Union Stock Yards, Chicago, and delivering the same without making any written memorandum, etc., as required by the act of Congress. The information also charged in a second count a sale, at the same place, of certain live stock and a delivery of a memorandum of the kind mentioned in the act of Congress and a failure and refusal to affix the stamps as provided for in such act. Upon the trial a *nolle prosequi* was duly entered upon the first count. The plaintiff in error claims that the act of Congress is unconstitutional on the same grounds mentioned in the other cases, and sets up as a special and separate defence that a sale at the stock yards is not included in the act of Congress, as it is not an "exchange or board of trade or other similar place," within the meaning of that act.

*Mr. Henry S. Robbins* and *Mr. John G. Carlisle* for appellants in Nos. 625 and 435, and for petitioner in No. 4 Original.

*Mr. John S. Miller* and *Mr. Merritt Starr* for plaintiff in error in No. 636.

*Mr. Solicitor General* for appellee in Nos. 625 and 435, and for defendants in error in No. 636.

Mr. Justice Peckham, after stating the facts, delivered the opinion of the court.

These cases may be considered together, because they involve substantially the same question, only the last one includes, in addition, a question of construction as distinguished from a question of the validity of the statute.

That portion of the act which is involved is set forth in the margin.[1] 30 Stat. 448, 451, 458.

---

[1] Adhesive Stamps.

Sec. 6. That on and after the first day of July, 1898, there shall be levied, collected and paid, for and in respect of the several bonds, debentures or certificates of stock and of indebtedness, and other documents, instruments, matters and things mentioned and described in Schedule A of this act, or for or in respect of the vellum, parchment or paper upon which such instruments, matters or things, or any of them, shall be written or printed by any person or persons, or party who shall make, sign or issue the same, or for whose use or benefit the same shall be made, signed or issued, the several taxes or sums of money set down in figures against the same, respectively, or otherwise specified or set forth in the said schedule.

Schedule A. — Stamp Taxes.    (30 Stat. 448–458.)

. . . Upon each sale, agreement of sale or agreement to sell any products or merchandise at any exchange or board of trade, or other similar place, either for present or future delivery, for each one hundred dollars in value of said sale or agreement of sale or agreement to sell, one cent, and for each additional one hundred dollars or fractional part thereof in excess of one hundred dollars, one cent: *Provided,* That on every sale or agreement of sale or agreement to sell as aforesaid, there shall be made and delivered by the seller to the buyer a bill, memorandum, agreement or other evidence of such sale, agreement of sale or agreement to sell, to which there shall be affixed a lawful stamp or stamps in value equal to the amount of the tax on such sale. And every such bill, memorandum or other evidence of sale or agreement to sell shall show the date thereof, the name of the seller, the amount of the sale, and the matter or thing to which it refers; and any person or persons liable to pay the tax as herein provided, or any one who acts in the matter as agent or broker for such person or persons, who shall make any such sale or agreement of sale, or agreement to sell, or who shall, in pursuance of any such sale, agreement of sale or agreement to sell, deliver any such products or merchandise without a bill, memorandum or other evidence thereof, as herein required, or who shall deliver such bill, memorandum or other evidence of sale, or agreement to sell, without having the proper stamps affixed thereto, with intent to evade the foregoing

It is seen that the cases embrace the facts of a member of the board of trade of Chicago, selling for immediate delivery, products or merchandise : (*a*) without making a memorandum; (*b*) making a memorandum but omitting to put stamps on it; (*c*) making a sale for future delivery and failing to put stamps on the memorandum.

In the *Nicol case*, (No. 435,) the sale was by a citizen to a citizen of the State of Illinois.

The case of sales at the Union Stock Yards at Chicago is also included where a memorandum is delivered, but the vendor neglects and refuses to affix the stamps to the memorandum.

The objections to the validity of the act are, stated generally, that it is a direct tax, and is illegal because not apportioned as required by the Constitution. If an indirect tax, it is a stamp tax on documents not required to be made under state law in order to render the sale valid, and Congress has no power to require a written memorandum to be made of transactions within the State for the purpose of placing a stamp thereon. It is not a privilege tax within the meaning of that term, because there is no privilege other than that which every man has to transact his own business in his own house or in his own office under such regulations as he may choose to adopt, and such a choice cannot be in any fair use of the term a privilege which is subject to taxation.

These questions are involved in each case, while in the last one it is further objected that the sales at the stock yards are not included in the terms of the act, and evidence was adduced upon the trial as to the nature of the business conducted at the stock yards, and the manner in which it was performed. It will be adverted to hereafter when we come to a discussion of the meaning and proper construction of the act.

It is always an exceedingly grave and delicate duty to decide upon the constitutionality of an act of the Congress of the United States. The presumption, as has frequently been

provisions, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall pay a fine of not less than five hundred nor more than one thousand dollars, or be imprisoned not more than six months, or both, at the discretion of the court.

said, is in favor of the validity of the act, and it is only when the question is free from any reasonable doubt that the court should hold an act of the lawmaking power of the nation to be in violation of that fundamental instrument upon which all the powers of the Government rest. This is particularly true of a revenue act of Congress. The provisions of such an act should not be lightly or unadvisedly set aside, although if they be plainly antagonistic to the Constitution it is the duty of the court to so declare. The power to tax is the one great power upon which the whole national fabric is based. It is as necessary to the existence and prosperity of a nation as is the air he breathes to the natural man. It is not only the power to destroy, but it is also the power to keep alive.

This necessary authority is given to Congress by the Constitution. It has power from that instrument to lay and collect taxes, duties, imposts and excises, in order to pay the debts and provide for the common defence and general welfare, and the only constitutional restraint upon the power is that all duties, imposts and excises shall be uniform throughout the United States, and that no capitation, or other direct, tax shall be laid, unless in proportion to the census or enumeration directed to be taken, and no tax or duty can be laid on articles exported from any State. (Constitution, article 1, sec. 8, and sec. 9, subdivisions 4 and 5.) As thus guarded, the whole power of taxation rests with Congress.

The commands of the Constitution in this, as in all other respects, must be obeyed; direct taxes must be apportioned, while indirect taxes must be uniform throughout the United States. But while yielding implicit obedience to these constitutional requirements, it is no part of the duty of this court to lessen, impede or obstruct the exercise of the taxing power by merely abstruse and subtle distinctions as to the particular nature of a specified tax, where such distinction rests more upon the differing theories of political economists than upon the practical nature of the tax itself.

In deciding upon the validity of a tax with reference to these requirements, no microscopic examination as to the purely economic or theoretical nature of the tax should be

indulged in for the purpose of placing it in a category which would invalidate the tax. As a mere abstract, scientific or economical problem, a particular tax might possibly be regarded as a direct tax, when as a practical matter pertaining to the actual operation of the tax it might quite plainly appear to be indirect. Under such circumstances, and while varying and disputable theories might be indulged as to the real nature of the tax, a court would not be justified, for the purpose of invalidating the tax, in placing it in a class different from that to which its practical results would consign it. Taxation is eminently practical, and is in fact brought to every man's door, and for the purpose of deciding upon its validity a tax should be regarded in its actual, practical results, rather than with reference to those theoretical or abstract ideas whose correctness is the subject of dispute and contradiction among those who are experts in the science of political economy.

In searching for proper subjects of taxation to raise moneys for the support of the Government, Congress must have the right to recognize the manner in which the business of the country is actually transacted; how, among other things, the exchange of commodities is effected; what facilities for the conduct of business exist; what is their nature and how they operate; and what, if any, practical and recognizable distinction there may be between a transaction which is effected by means of using certain facilities, and one where such facilities are not availed of by the parties to the same kind of a transaction. Having the power to recognize these various facts, it must also follow that Congress is justified, if not compelled, in framing a statute relating to taxation, to legislate with direct reference to the existing conditions of trade and business throughout the whole country and to the manner in which they are carried on.

Coming to a consideration of the objections raised to this statute it is well to first consider the nature of an exchange or board of trade, and then to inquire more in detail as to the validity of the act with reference to sales at such places. The Chicago board of trade may be taken as a type of the

others in existence throughout the country, because the same features exist in all of them, while the size and importance of the Chicago institution serve only to make such features more prominent and their effect more easily discernible. We say the same features exist in all of the exchanges or boards of trade because we have the right to consider facts without particular proof of them, which are universally recognized and which relate to the common and ordinary way of doing business throughout the country, and while we could not take notice without proof as to any particular constitution or by-law of a body of this description, yet we are not thereby cut off from knowledge of the general nature of those bodies and of the manner generally in which business therein is conducted.

It appears in this record that the Chicago board of trade is a voluntary association of individuals who meet together at a certain building owned by the association for the purpose of there transacting business. This particular board is incorporated under an act of the legislature of Illinois, though its corporate character does not, in our judgment, form a material consideration in the inquiry. The members of the association meet daily between certain business hours for the purpose of buying and selling flour, wheat, corn, oats and other articles of food products, and for the transaction of such other business as is incident thereto. Among its members are some whose business it is to purchase in the country or to receive on consignment from persons in the country some or all of the articles which are dealt in on the floor of the exchange, and there are other members whose business it is to buy such articles upon the exchange either for themselves or on commission, and to deliver or ship the same to consumers or distributors throughout the country and in Europe.

It is common knowledge that these exchanges encourage and promote honest and fair dealing among their members; that they provide penalties for the violation of their rules in that regard, and that contracts between members relating to business on the exchange have the advantage of the sanction provided by the exchange for such purposes. They furnish a

meeting place for those engaged in the purchase and sale of commodities or other things to be sold, and in that way they offer facilities for a market for them. Dealings among members so engaged tend to establish the market price of the articles they deal in, and that price is very apt to be the price for the same article when bought or sold outside. The price is arrived at by offers to sell on the one side and to purchase on the other until, by what has frequently been termed, the "higgling" of the market, a price is agreed upon and the sales are accomplished. In arriving at this price, of course the great law of the cost of production and also that of supply and demand enter into the problem, and it is upon a consideration of all matters regarded as material that the agreement to buy and sell is made. The prices thus fixed are usually followed when the transaction occurs outside, and the market price means really the exchange price. That an enormous amount of the business of the country which is engaged in the distribution of the commodities grown or produced therein is transacted and takes place through the medium of boards of trade or exchanges cannot be doubted. Nor is there any doubt that these exchanges facilitate transactions of purchase and sale, and it would seem that such facilities or privileges, even though not granted by the Government or by a State, ought nevertheless to be recognized as existing facts and to be subject to the judgment of Congress as fit matters for taxation.

We will now examine the several objections that have been offered to this statute.

It may be stated, of course, that if the tax herein is a direct tax within the meaning of the Constitution, it is void, for there is no apportionment as required by that instrument.

It is asserted to be a direct tax, because it is a tax upon the sale of property measured by the value of the thing sold, and such a tax is a direct tax upon the property itself, and therefore subject to the rule of apportionment. Various cases are cited, from *Brown* v. *Maryland*, 12 Wheat. 419, down to those involving the validity of the income tax, 157 U. S. 429; 158 U. S. 601, for the purpose of proving the correctness of this proposition. All the cases involved the question whether the

taxes to which objection was taken amounted practically to a tax on the property. If this tax is not on the property or on the sale thereof, then these cases do not apply.

We think the tax is in effect a duty or excise laid upon the privilege, opportunity or facility offered at boards of trade or exchanges for the transaction of the business mentioned in the act. It is not a tax upon the business itself which is so transacted, but it is a duty upon the facilities made use of and actually employed in the transaction of the business, and separate and apart from the business itself. It is not a tax upon the members of the exchange nor upon membership therein, nor is it a tax upon sales generally. The act limits the tax to sales at any exchange, or board of trade, or other similar place, and its fair meaning is to impose a duty upon those privileges or facilities which are there found and made use of in the sale at such place of any product or merchandise. Whether this facility or privilege is such a thing as can be legally taxed, while leaving untaxed all other sales made outside of such places, will be discussed further on. At present it is enough to say that the tax is not upon the property sold, and cannot on that ground be found to be direct. The tax laid in the same act upon a broker's note or memorandum of sale is a separate tax, although it may have reference to the same transaction. It is a tax on the note or memorandum itself where made by a broker, while in the other case the tax, although measured in amount by reference to the value of the thing sold, is in reality upon the privilege or facility used in the transaction or sale. The tax is not a direct tax within the meaning of the Constitution, but is, as already stated, in the nature of a duty or an excise. The amount of such a tax when imposed in a case like this may be increased or diminished by the extent to which the privilege or facility is used, and it is measured in this act by the value of the property transferred by means of using such privilege or facility, but this does not make the tax a direct one. A tax on professional receipts was recognized by the present Chief Justice in delivering the opinion of the court on the first hearing of the *Income Tax case*, 157 U. S. 429, 579, as an excise or duty and

therefore indirect, while a tax on the income of personalty he thought might be regarded as direct. And upon the rehearing, 158 U. S. 601, it was distinctly held that the tax on personal property or on the income thereof was a direct tax. This tax is neither a tax on the personal property sold nor upon the income thereof, although its amount is measured by the value of the property that is sold at the exchange or board of trade.

It is also said that the tax is direct because it cannot be added to the price of the thing sold, and therefore ultimately paid by the consumer. In other words, that it is direct because the owner cannot shift the payment of the amount of the tax to some one else. This however assumes that the tax is not in the nature of a duty or an excise, but that it is laid directly upon the property sold, which we hold is not the case. It is not laid upon the property at all, nor upon the profits of the sale thereof, nor upon the sale itself considered separate and apart from the place and the circumstances of the sale.

We do not see that any material difference exists when the sale is for future delivery. The thing agreed to be sold is the same, whether for immediate or future delivery, and the fact that the sale for future delivery may subsequently be carried out by the actual payment of the difference between the agreed and the market price at the time agreed upon for such delivery does not affect the case. The privilege used is the same whether for immediate or future delivery, and the same rule applies to both.

Passing these grounds of objection, it is urged that if this is an indirect tax, it is not uniform throughout the United States as required by the Constitution. Sales at an exchange or board of trade, it is said, are singled out for taxation under this act, although they differ in no substantial respect from sales at other places, and there is therefore no just ground for segregating or classifying such sales from those made elsewhere. A sale at an exchange or board of trade, it is claimed, is not a privilege or facility which can or justly ought to be taxed while all other sales at all other places are exempted from

taxation, and there is no reasonable ground therefore for the assertion that such a tax is uniform within the meaning of the Constitution. It is said not to be uniform because it is unequal, taxing sales at exchanges and exempting all other sales, while at the same time there is no natural basis for any distinction between such sales, the distinction made being purely arbitrary and unreasonable.

This general objection on the ground of want of uniformity is not, in our judgment, well founded. Whether the word "uniform" is to be understood in what has been termed its "geographical" sense, or as meaning uniformity as to all the taxpayers similarly situated with regard to the subject-matter of the tax, we think this tax is valid within either meaning of the term. In our judgment a sale at an exchange does form a proper basis for a classification which excludes all sales made elsewhere from taxation. If it were to be assumed that taxes upon corporate franchises or privileges may be imposed only by the authority that created them, it does not follow that no privilege or facility can be taxed which is not created by the government of a State or by Congress. In order to tax it the privilege or facility must exist in fact, but it is not necessary that it should be created by the Government. The question always is, when a classification is made, whether there is any reasonable ground for it, or whether it is only and simply arbitrary, based upon no real distinction and entirely unnatural. *Gulf, Colorado &c. Railway* v. *Ellis,* 165 U. S. 150–155 ; *Magoun* v. *Illinois Trust & Savings Bank,* 170 U. S. 283, 294. If the classification be proper and legal, then there is the requisite uniformity in that respect.

A tax upon the privilege of selling property at the exchange and of thus using the facilities there offered in accomplishing the sale differs radically from a tax upon every sale made in any place. The latter tax is really and practically upon property. It takes no notice of any kind of privilege or facility, and the fact of a sale is alone regarded. Although not created by Government, this privilege or facility in effecting a sale at an exchange is so distinct and definite in its character, and constitutes so clear and plain a difference from a sale

elsewhere, as to create a reasonable and substantial ground for classification and for taxation when similar sales at other places are untaxed. A sale at an exchange differs from a sale made at a man's private office, or on his farm, or by a partnership, because, although the subject-matter of the sale may be the same in each case, there are at an exchange certain advantages in the way of finding a market, obtaining a price, the saving of time, and in the security of payment, and other matters, which are more easily obtained there than at an office or upon a farm. To accomplish a sale at one's farm or house or office might and probably would occupy a great deal of time in finding a customer, bringing him to the spot and agreeing on a price. All this can be done at an exchange in the very shortest time and at the least inconvenience. The market is there, and all that is necessary is to send the commodity. Although a sale is the result in each case and the thing sold may be of the same kind, the difference exists in the means and facilities for accomplishing such sale, and those means and facilities there is no reason for saying may not be taxed, unless all sales are taxed, whether the facilities be used or not.

In this case there is that uniformity which the Constitution requires. The tax or duty is uniform throughout the United States, and it is uniform, or, in other words, equal, upon all who avail themselves of the privileges or facilities offered at the exchanges, and it is not necessary in order to be uniform that the tax should be levied upon all who make sales of the same kind of things, whether at an exchange or elsewhere.

Another objection taken is that Congress taxes only those who make sales and not those who make purchases, and those who sell products or merchandise and not those who sell bonds, stocks, etc. These are discriminations, it is said, which do not follow the rule of uniformity, and hence render the tax void.

A purchase occurs whenever a sale is effected, and to say that a purchaser at an exchange sale must be taxed for the facilities made use of in making the purchase, or else that the tax on the seller is void, is simply to insist upon doubling the tax.

Nor is it necessary to tax the use of the privilege under all circumstances in order to render the tax valid upon its use in particular cases. We see no reason why it should be necessary to tax a privilege whenever it is used for any purpose, or else not to tax it at all. It is not in its nature indivisible. A tax upon the privilege when used for one purpose does not require for its validity that the same privilege should also be taxed when used for another and a totally distinct purpose. It may be the same privilege, but when it is used in different cases to accomplish sales of wholly different things, between which there is no relation whatever, one use may be taxed and the other not, and no rule of uniformity will thereby be violated.

It is also objected that there is no power in Congress to require a party selling personal property, in the course of commerce within the State, to make a written note or memorandum of the contract, and to punish him by fine and imprisonment for a failure to do so; if the State do not require a memorandum on a sale, Congress cannot in the exercise of the taxing power compel a citizen to make one in order that it may be taxed by the United States.

In holding that the tax under consideration is a tax on the privilege used in making sales at an exchange, we thereby hold that it is not a tax upon the memorandum required by the statute upon which the stamp is to be placed. The act does not assume to in any manner interfere with the laws of the State in relation to the contract of sale. The memorandum required does not contain all the essentials of a contract to sell. It need not be signed, and it need not contain the name of the vendee or the terms of payment. The statute does not render a sale void without the memorandum or stamp, which by the laws of the State would otherwise be valid. It does not assume to enact anything in opposition to the law of any State upon the subject of sales. It provides for a written memorandum containing the matters mentioned, simply as a means of identifying the sale and for collecting the tax by means of the required stamp, and for that purpose it secures by proper penalties the making of

the memorandum. Instead of a memorandum, Congress might have required a sworn report with the proper amount of stamps thereon to be made at certain regular intervals, of all sales made subject to the tax.' Other means might have been resorted to for the same purpose. Whether the means adopted were the best and most convenient to accomplish that purpose was a question for the judgment of Congress, and its decision must be conclusive in that respect.

The means actually adopted do not illegally interfere with or obstruct the internal commerce of the States, nor are such means a restraint upon that commerce so far as to render the means adopted illegal. That Congress might have adopted some other means for collecting the tax which would prove less troublesome or annoying to the taxpayer, can surely be no reason for holding that the method set forth in the act renders the tax invalid. As it has the power to impose the tax, the means to be adopted for its collection within reasonable and rational limits must be a question for Congress alone.

We come now to the special objection raised in the *case of Ingwersen*, No. 636, and which applies to this case alone.

The sales were made at the Union Stock Yards, and it is claimed the statute does not cover the case of sales there made, because it is not an exchange or board of trade or other similar place.

The facts upon which the question arises are found in the record, and it shows that the Union Stock Yard and Transit Company of Chicago is a corporation which was incorporated under the laws of the State of Illinois in 1865. Under that charter the company had power to maintain cattle yards for the reception and safekeeping, feeding, weighing and transfer of cattle and other matters connected therewith, which are set out in full in the charter. The character of the business and the manner in which it is conducted are fully set forth in the record, from which the following extract is taken:

"The Union Stock Yards described in this information, at the respective times therein mentioned and theretofore and since, covered and cover three hundred and thirty-five acres of land situated between Thirty-ninth street and Forty-seventh

street and Halstead street and Ashland avenue, in the city of Chicago, in the county of Cook and State of Illinois, of which two hundred acres are covered by pens, which are made by fences surrounding and enclosing the same, there being alleys running through the yards separating the pens, into which alleys gates lead from the pens. The number of the pens is about five thousand and they are in size respectively from eight feet square to fifty feet square. Railway tracks belonging to and operated by the Chicago Junction Railway Company, which connect with all the lines of railway to the city of Chicago, extend into the yards, over which cattle, hogs and other live stock received at or shipped from the Union Stock Yards are carried. Upon the arrival of cattle, hogs or other live stock at the Union Stock Yards consigned to the commission merchant at the Union Stock Yards, such cattle, hogs or other live stock are placed by the owner or consignee thereof or his or its agents, in one or more of the pens, and are there cared for, fed and watered by such owner or consignee. Any person is at liberty to send, take or to receive cattle, hogs or other live stock into the Union Stock Yards, and there place or have the same placed in a pen or pens, care for the same, and there sell any cattle belonging to him or which he has the right to sell. Any person has access to the pens containing cattle, hogs or other live stock for the purpose of buying the same, and has liberty to purchase or negotiate for the purchase thereof. Sales of cattle, hogs and other live stock in the yards are at private sale. Commission merchants having cattle, hogs or other live stock in a pen or pens in the yards seek and solicit a buyer therefor, and when a proposed buyer is so found take him to the pens in which such live stock is contained, and there exhibit such live stock; and to such proposed buyer, or to any person who may come to said pen and who may desire to buy, such live stock is sold in the pen in which they are yarded. Sales of cattle, hogs and sheep in the yards are by weight, and upon a sale thereof being made such live stock is taken by the owner or commission merchant having charge thereof from the pen in which it is confined to a scale or scales in the yard and belonging to the Union Stock

Yard and Transit Company, and are there weighed by a weighmaster employed by the Union Stock Yard and Transit Company and in charge of the scale in which said live stock are weighed, and the weight of such live stock is thereby determined as the weight for which the purchaser pays upon his purchase, and the amount of the purchase price at the price per pound or per hundred pounds fixed in such sale is thereby determined."

The corporation has nothing to do with the selling or purchasing of stock of any kind. The market at the Union Stock Yards is unquestionably the largest in the country.

The plaintiff in error at these yards as agent for a corporation then carrying on the business of a live stock commission character and which was a dealer in live stock, sold to another as agent for the Eastman Company, also a corporation created for the purpose of dealing in live stock, a certain amount of merchandise for present delivery without affixing any stamp to the memorandum.

We cannot see any real distinction sufficient in substance to call for a different decision between the Union Stock Yards and an exchange or board of trade. We think it is a "similar place" within the meaning of the statute under consideration.

It is true that there are no sales or purchases of stock made by members of the stock yards company as such. Any one is accorded the right to bring his cattle to the stock yards upon payment of the regular fees and compliance with the regulations made by the company, and having brought his cattle he has the right accorded him by the company to have them kept, fed, watered, etc., and to sell them himself or by a commission merchant who need not be a member of the stock yards company.

It is plain to be seen that the privilege or facility for a sale of the cattle or other stock at the yards of such company is of precisely the same nature and character as that which exists at an exchange or board of trade which is so described in terms. That the sales are made by the owners of the cattle or by commission merchants who are not members of the

stock yards company, is not material. The facilities for a sale exist and are made use of in each case, and are in truth the same in each. A perusal of the facts contained in the record in the case shows that those yards answer all the purposes of an exchange or board of trade, and that they in truth amount in substance to the same thing. The differences existing between them are unsubstantial so far as this point is concerned. The sales at that place are accomplished with a facility, which it is plain could not exist but for the conditions and advantages afforded by the use of those yards.

The owner of the cattle who brings them to the yards and avails himself of the privilege of selling them at that place does without doubt make use of a privilege which every one knows is an advantage sufficient to constitute a material difference between a sale at the yards and a sale elsewhere. This advantage, although one which any person could use, is yet of precisely the same nature as that existing in the case of an exchange or board of trade, and it is therefore a similar place within the meaning of the statute. Being a similar place, the reasons stated in the foregoing cases apply with equal force here and demand the same judgment.

For the reasons above stated, we make the following disposition of the cases before us:

In Nos. 435 and 625, the orders of the Circuit Court of the United States for the Northern District of Illinois are affirmed.

In No. 4 Original, the petition for a writ of *habeas corpus* is denied.

In No. 636, the judgment of the District Court of the United States for the Northern District of Illinois is affirmed.

*So ordered.*

MR. JUSTICE BROWN and MR. JUSTICE WHITE concurred in the result.