UNITED STATES v. THOMAS.

(Circuit Court, S. D. New York. January 28, 1902.)

INTERNAL REVENUE—STAMP TAX—SALES OF CORPORATE STOCK—CONSTITUTIONAL LAW.

The defendant was indicted for omitting to attach the required revenue stamps, provided by the war revenue act of 1898, upon memoranda of sale of certain shares of railroad stock, with intent to evade the provisions of section 25, Schedule A, entitled "Stamp Taxes," of such act of congress. The indictment was demurred to on the ground that the act of congress mentioned is unconstitutional; the defendant's contention being that a tax on sales of shares or certificates of stock is a "direct tax," and that it has not been laid in proportion to the census or enumeration, nor apportioned among the several states according to their respective numbers. *Held*, that the tax is not a direct tax, not being a tax upon the property itself, but upon a business, occupation, or transaction, and the burden being upon the person who engages in the business of selling shares of stock.

Henry L. Burnett, U. S. Atty., and William S. Ball, Asst. U. S. Atty. Pavey & Moore (Frank D. Pavey, of counsel), for defendant.

THOMAS, District Judge. The defendant demurs to an indictment, which charges that he, being a broker in the city of New York, sold certain shares of Atchison preferred stock, and omitted the required revenue stamps from the memorandum of sale, with intent to evade the war revenue act of 1898. The act provides:

"Adhesive Stamps.

"Section 6. That on and after the first day of July, eighteen hundred and ninety-eight, there shall be levied, collected and paid, for and in respect of the several bonds, debentures, or certificates of stock and of indebtedness, and other documents, instruments, matters and things mentioned and described in Schedule A of this act, or for or in respect of the vellum, parchment, or paper upon which such instrument, matters, or things, or any of them, shall be written or printed by any person or persons, or party who shall make, sign, or issue the same, or for whose use or benefit the same shall be made, signed, or issued, the several taxes or sums of money set down in figures against the same, respectively, or otherwise specified or set forth in the said schedule. * * *

"Schedule A.

"Stamp Taxes.

"Bonds, debentures, or certificates of indebtedness issued after the first day of July, Anno Domini eighteen hundred and ninety-eight, by any association, company, or corporation, on each hundred dollars of face value or

fraction thereof, five cents, and on each original issue, whether on organization or reorganization, of certificates of stock by any such association, company, or corporation, on each hundred dollars of face value or fraction thereof, five cents, and on all sales, or agreements to sell, or memoranda of sales or deliveries or transfers of shares or certificates of stock in any association, company or corporation, whether made upon or shown by the books of the association, company, or corporation, or by any assignment in blank, or by any delivery, or by any paper or agreement or memorandum or other evidence of transfer or sale whether entitling the holder in any manner to the benefit of such stock, or to secure the future payment of money or for the future transfer of any stock, on each hundred dollars of face value or fraction thereof, two cents: provided, that in case of sale where the evidence of transfer is shown only by the books of the company the stamp shall be placed upon such books; and where the change of ownership is by transfer certificate the stamp shall be placed upon the certificate; and in cases of an agreement to sell or where the transfer is by delivery of the certificate assigned in blank there shall be made and delivered by the seller to the buyer a bill or memorandum of such sale, to which the stamp shall be affixed; and every bill or memorandum of sale or agreement to sell before mentioned shall show the date thereof, the name of the seller, the amount of the sale, and the matter or thing to which it refers. And any person or persons liable to pay the tax as herein provided, or anyone who acts in the matter as agent or broker for such person or persons, who shall make any such sale, or who shall in pursuance of any such sale deliver any such stock, or evidence of the sale of any such stock or bill or memorandum thereof, as herein required, without having the proper stamps affixed thereto, with intent to evade the foregoing provisions, shall be deemed guilty of a misdemeanor."

The defendant urges that the statute, so far as here involved, is unconstitutional. He premises that a certificate of stock is property; that a tax on the sale of property is a tax on the property itself; and from this he concludes that the act provides for levying, without apportionment, a direct, and hence invalid, tax on such property.

The statute lays a stamp duty (1) on the bonds, debentures, or certificates of indebtedness issued by any association, company, or corporation; (2) on original certificates of stock issued by any such body; (3) on all subsequent sales, or agreements to sell, or memoranda of sales or deliveries or transfers of such certificates.

The present inquiry relates to a tax on a memorandum or contract of sale of a certificate of stock. What is such certificate? It is the evidence of the holder's title to shares in the property and franchises of a corporation. The sale of the certificate is a transfer of such shares to another person. The state furnishes facilities whereby persons may form a corporation, which may designate the individual interests of its members by certificates, transferable upon its books, so as to permit the holders to manage or direct the business of the corporation, with such liability, privileges, and immunity as the charter and the law provide. Congress has declared that every person who holds such a certificate in such artificial body, and shall transfer by sale to another the right to participate in such corporation and to become a member thereof, with the accompanying property rights and benefits, shall pay a tax on the contract or transaction whereby the transmission is effected. It is not intended at this time to emphasize the benefits and protection afforded by the law to the members of such bodies, and the enhanced value of their property rights by reason of the facilities afforded them. In a matter of less importance such privilege would deserve, at least, consid-

eration, but the present discussion will pursue broader views and inquiries.

The defendant relies upon certain decisions of the supreme court, and judicial expressions in the opinions, to wit, that congress may not levy a stamp tax on bills of lading of goods exported (Fairbank v. U. S., 181 U. S. 283, 21 Sup. Ct. 648, 45 L. Ed. 862); nor levy a license tax upon an importer (Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678); nor tax sales by auctioneers of imported goods in the original packages (Cook v. Pennsylvania, 97 U. S. 566, 24 L. Ed. 1015); nor lay a license tax upon goods not the product of the state, but brought therein for sale (Welton v. Missouri, 91 U. S. 279, 23 L. Ed. 347); nor tax a bill of lading for metal shipped from a point within, to a point without, the state (Almy v. California, 24 How. 169, 174, 16 L. Ed. 644); nor lay a license tax on drummers selling or offering for sale goods by sample, and having no licensed house of business in the taxing district (Robbins v. Shelby Co. Taxing Dist., 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694). These cases involve attempts on the part of the United States to tax exports, or of states to tax imports or exports, or to lay taxes on subjects of interstate commerce. They contain statements or holdings that a tax on the occupation of importer or exporter is a tax on the goods imported or exported; that a tax on a bill of lading of export goods is a tax on the goods; that a tax on a vendor of foreign goods is a tax on what he sells; that a tax upon sales of imported goods in the original packages, payment whereof is obligatory upon the auctioneer, is a tax on the goods; and that a tax on the sale of an article imported only for sale is a tax on the article itself. Brown v. Maryland, 12 Wheat. 444, 6 L. Ed. 678. It will be observed that in each instance the subject-matter of the tax was not within the taxing power. Hence no tax, direct or indirect, could be laid thereon, under any disguise whatsoever. The taxation of property other than exports is within the power of congress, although the tax must be raised in the manner pointed out by the constitution; that is, "direct taxes by the rule of apportionment, and indirect taxes by the rule of uniformity." The defendant quotes with some special urgency from the opinion in Nicol v. Ames, 173 U. S. 513, 19 Sup. Ct. 524, 43 L. Ed. 786, where the following portion of the war revenue act of 1898 is construed:

"Upon each sale, agreement of sale or agreement to sell any products of merchandise at any exchange or board of trade, or other similar place, either for present or future delivery, for each one hundred dollars in value of said sale or agreement of sale or agreement to sell, one cent, and for each additional one hundred dollars or fractional part thereof in excess of one hundred dollars, one cent."

It was held that the tax was laid upon the facilities of the exchange, and was valid. Mr. Justice Peckham, in the course of the opinion, said:

"A tax upon the privilege of selling property at the exchange, and of thus using the facilities there offered in accomplishing the sale, differs radically from a tax upon every sale made in any place. The latter tax is really and practically upon property. It takes no notice of any kind of privilege or facility, and the fact of a sale is alone regarded."

115 F.—14

The defendant infers from this excerpt that a tax upon sales of property is a direct tax, and invalid unless apportioned. The defendant's argument, so far as based on the decisions, other than the last cited, may be tested. It is that inasmuch as the tax on an importer, bill of lading of export goods, sales by auctioneers of imported goods for the importer, vendors of goods from beyond the taxing state, is a tax upon the goods themselves, and invalid, so a tax on transfers of property is a direct tax upon the property itself. The fallacy of this method of argument quickly appears. Thus a license tax on the importer of tobacco is a tax on the goods imported; hence, a tax on a dealer in domestic tobacco is a direct tax on his commodity. A license tax by a state upon foreign salesmen is a tax on the subjects of their sales; hence a federal tax on the occupation of a salesman, in the state where he resides, is a direct tax on the goods sold by him in that state. A tax on a bill of lading of goods for export is a tax on the goods; hence a federal tax on a domestic bill of lading is a direct tax on the goods. Therefore, the occupations of tobacco dealers, salesmen, and transportation companies are not subjects of an unapportioned federal tax, and the taxes laid upon occupations, the selling of property, and trades, found in the act of 1898 and earlier acts, are invalid. But the power of congress to tax occupations, business, trades, transfers of property, and contracts has long since been recognized. Railroad Co. v. Slack, 100 U. S. 595, 598, 25 L. Ed. 647; Pollock v. Trust Co., 157 U. S. 429, 15 Sup. Ct. 673, 39 L. Ed. 759. To such consequence does the defendant's reasoning lead. Syllogisms should not be fashioned upon judicial expressions detached from the particular inquiry at some former time under consideration. The present question is whether a statute providing for a tax on contracts for the sale and delivery of certificates of stock lays a direct tax upon property, within the meaning of the constitution. It is a mere truism that a tax, whatever its form, falls primarily on the taxpayer's property, for how otherwise could it be paid? If a farmer actually pay a tax for the privilege of following his vocation, is not something exacted from his farm, stock, or other property? The same is the case if the tax be laid on the sale of the products of the farm. If a railroad company be taxed on bills of lading, the tax, when paid, is charged to operating expenses, and the result is precisely the same as if the tax were laid upon roadbed and equipment. Yet in no one of the three cases is the tax assessed on the property, nor is the property specifically subjected to the tax. The law commands that, when the owner shall do an act,—for instance, the act of selling property,—he, personally, in the first instance, shall pay a tax. So, if a tax, measured by the proceeds of sale, be laid on the privilege of selling articles in an exchange, the vendor, in case of sale, will have the precise amount of money at night as if the tax had been laid upon the sale of property, or upon the property itself. In short, the tax, however laid, when paid, burdens the taxpayer's property. But all this does not prove that the tax is direct. A system of taxation upon the sale of property is, in essential elements, different from a system that lays the

tax directly upon property. The latter system is certain, because the tax is sure to arise and to be paid in any event. There is but a single condition requisite to the existence and payment of such tax, and that is the existence of the property. The statute is direct in its application, and, in theory, payment is inevitable, and to such payment principal and income alike are pledged. But a tax payable on the sale of property is contingent upon, and is laid upon, an event that may never arise, and the tax in the meantime is non-existent. For example, a statute providing for a direct tax on a parcel of land is, save as delayed by the acts of assessment and levy, instant in its operation; and the tax attaches as a lien upon the land, from which it may be dissociated only by payment. A statute directing a tax on contracts of sale of land is entirely executory, and may never be executed, and the estate continues in the hands of the owner, without burden or incumbrance. In the case at bar the affixing of the stamp awaits the sale, and even then the certificate passes without disability to the transferee. Hence no burden is laid on the certificate, nor does it ever become liable for the payment of the tax. The law simply says to the vendor, "When you do an act, you shall pay a tax." Moreover, a provision for a direct tax on land at once decreases its beneficial value, whether it be kept or sold, while a tax on an instrument of conveyance or transfer leaves the enjoyment intact. The present owner and his heirs forever may hold the property without diminution of profit. In the one case the state, in effect, seizes the land by the force of the statute, and there is no latitude,—no escape from the compulsory tribute. In the other nothing is taken away from the enjoyment of rights of ownership, save that, in the event of the owner engaging in the business transaction of selling or exchanging his property, a tax must be paid thereon, taking the form of a stamp duty on the indenture, or, if it be personal property, on a bill of sale or contract. It is simply a tax upon transactions in business activities, or forms of commercial dealings, and may be sustained on several grounds. In the first place, the statute may rest upon the power of congress to declare that any person who shall engage in the business (that is occupation) of buying or selling certificates of stock shall pay a tax measured by the price realized. Is not such a statute lawful? The buying and selling of stocks, not by brokers alone, but by a large number of persons in every community who profess some other main vocation, is an occupation more or less constant. This has become a business,—a vocation,—and is amenable to federal taxation as such. These persons, maybe, could not be so well reached if the statute laid a gross duty in the form of a license tax on the individual trader in stocks. But in any case congress has the power to distribute such tax upon each item of business falling under the traffic. For if it may lay a tax of $100 on the vocation of buying and selling stocks, it may lay a tax on the sale of stocks at the rate of 2 cents "on each hundred dollars" sold. The principle that justifies an impost of $10 per annum on a baker supports the right to lay a tax of a fraction of a mill on the sale of each loaf of his bread. The principle that underlies the power, and not the peculiar

form of its exercise, is regarded. Therefore it is not an answer that the instance charged may have been the only transaction of the dealer.

How many sales of certificates are necessary to constitute the business of a vendor of certificates,—5, 10, 20, or 1,—and at what state of his sales will his business be sufficiently apparent to compel the dealer to stamp his transactions? At what point in his business career does the statute become constitutional? The act of 1898, like that of 1862, provides for a tax on many and varied occupations. How many items of business may a person do under each vocation, and so far forth escape the tax? How many instances of sales must the government show against a defendant to establish the validity of the statute as to him? A tax is laid upon retail vendors of tobacco. May a person sell tobacco now and then without paying a tax? So a tax is placed upon the vendors of liquor, but may a person escape compliance with this tax upon the plea that the transaction was his first, second, or some other in numerical order, and that he did not sell liquor for a business? Is the answer that the offender never did it before a defense against the charge of violating the revenue statute? If such be the law, a tax may not be placed upon the occupation, business, or selling, of liquors, tobacco, or stock, or any other thing, consumable or nonconsumable, except under the necessity, in case of attempted enforcement, of proving beyond a reasonable doubt that the vendor had made sufficient sales, so that it may be inferred that it was his regular vocation, and that he was engaged uniformly in the business. In that case the statute would become valid or invalid as the jury might determine. The law is that he shall not pursue a certain business without paying the tax, and, if congress may validly declare that, it may declare that he shall not, untaxed, do any of the business acts that fall within the occupation. A person pursues a business or vocation, whether or not he announces it as his profession. It is what he does, and not what he professes, that determines. It seems to be a political, rather than a judicial, function, to determine what shall constitute a business.

But it may be answered that an unapportioned tax may not be laid upon sales of property unless the tax, in whole or part, may be shifted to another. Such rule would preclude a tax upon occupations. Aside from that consideration, the ultimate incidence of the tax has been very sparingly employed in the solution of questions similar to the one now before the court. The discussions and opinions of political economists are useful for the instruction of legislators in enacting, rather than for judges in the interpretation of, statutes, and the judgments of the court have often disregarded the conclusions of the systematic writers. For instance, Mr. McCulloch (McCul. Tax'n, p. 181) states, "Duties on coaches, carriages, * * * fall wholly on those by whom they are used, and cannot be shifted to any one else." But the supreme court decided that a tax on carriages was indirect in its nature. Hylton v. U. S., 3 Dall. 171, 1 L. Ed. 556. In Veazie Bank v. Fenno, 8 Wall. 533, 19 L. Ed. 482, it was determined that an act of congress (14 Stat. 146)

which provides "that every national banking association, state bank, or state banking association, shall pay a tax of ten per centum on the amounts of the notes of any state bank, or state banking association, paid out by them," did not lay a direct tax, within the meaning of the constitution. Mr. Chief Justice Chase said:

"Much diversity of opinion has always prevailed upon the question, what are direct taxes? Attempts to answer it by reference to the definitions of political economists have been frequently made, but without satisfactory results. The enumeration of the different kinds of taxes which congress was authorized to impose was probably made with very little reference to their speculations. The great work of Adam Smith, the first comprehensive treatise on political economy in the English language, had then been recently published; but in this work, though there are passages which refer to the characteristic difference between direct and indirect taxation, there is nothing which affords any valuable light on the use of the words 'direct taxes' in the constitution. We are obliged, therefore, to resort to historical evidence, and to seek the meaning of the words in the use and in the opinion of those whose relations to the government, and means of knowledge, warranted them in speaking with authority."

After such historical references, the learned chief justice adds:

"This review shows that personal property, contracts, occupations, and the like, have never been regarded by congress as proper subjects of a direct tax."

In Knowlton v. Moore, 178 U. S. 41, 82, 20 Sup. Ct. 763, 44 L. Ed. 969, Mr. Justice White said:

"It is true that in the Income Tax Cases the theory of certain economists, by which direct and indirect taxes are classified with reference to the ability to shift the same, was adverted to. But this disputable theory was not the basis of the conclusion of the court. The constitutional meaning of the word 'direct' was the matter decided. Considering that the constitutional rule of apportionment had its origin in the purpose to prevent taxes on persons solely because of their general ownership of property from being levied by any other rule than that of apportionment, two things were decided by the court: First, that no sound distinction existed between a tax levied on a person solely because of his general ownership of real property, and the same tax imposed solely because of his general ownership of personal property; secondly, that the tax on the income derived from such property, real or personal, was the legal equivalent of a direct tax on the property from which said income was derived, and hence must be apportioned. These conclusions, however, lend no support to the contention that it was decided that duties, imposts, and excises, which are not the essential equivalent of a tax on property generally, real or personal, solely because of its ownership, must be converted into direct taxes, because it is conceived that it would be demonstrated by a close analysis that they could not be shifted from the person upon whom they first fall."

In Nicol v. Ames, 173 U. S. 519, 19 Sup. Ct. 522, 43 L. Ed. 786, the tax was measured precisely by the sum realized on the sale, and fell on the vendor or vendee, under the same economic law that would govern in the case at bar, for the law does not change accordingly as the same shares may be sold within or without an exchange. The curious investigator will find much instruction, and gather no little suspicion of the doctrine of political economists as guides to constitutional interpretation, if he will consult Prof. Seligman's article on the "Shifting and Incidence of Taxation," in the Publications of the American Economic Association (volume 7, p. 6,

et seq.). The narration of the disagreements, past and present, of these theorists, may leave him in doubt whether the usual tax assessed upon real property is not, after all, indirect.

At this point the history of the taxation of contracts will be considered, and proper inference drawn therefrom. It does not appear from the discussion of counsel or the opinions in the Pollock Case that contracts were the subject of direct taxation prior to the adoption of the constitution, nor that economists or jurists have characterized them as such. But shortly after the formation of the national government a system of laying stamp duties upon such contracts was inaugurated. By chapter 11 of the act of July 6, 1797 (1 Stat. 527), a stamp duty was placed on "bonds, bills, * * * foreign or inland bill of exchange, promissory note, or other note for the security of money * * * any certificate of a share in any insurance company, or any certificate of a share in the Bank of the United States, or of any state, or other bank" (section 1). Chapter 53 of the act of August 2, 1813 (3 Stat. 77), similarly laid a tax on any bond, obligation, or promissory note or notes not issued by any bank, companies, or banker, as aforesaid, discounted by any such bank, company, or banker, and on any foreign or inland bill or bills of exchange above $50, and having one or more indorsers. Chapter 119 of the act of 1862 (12 Stat. 479), laid a tax upon bank checks, inland bills of exchange, drafts, or orders for the payment of money, certificates of stock in any incorporated company, certificates of deposit, broker's note, or memorandum of sale of any goods or merchandise, stocks, bonds, exchange, notes of hand, real estate, or property of any kind or description, issued by brokers, or persons acting as such, also any "deed, instrument, or writing, whereby any lands, tenements, or other realty sold shall be granted, assigned, transferred or otherwise conveyed to, or vested in, the purchaser or purchasers, or any other person or persons, by his, her, or their direction"; also any "lease, agreement, memorandum, or contract for the hire, use, or rent of any land, tenement, or portion thereof"; also any "mortgage of lands, estate, or property, real or personal, heritable or movable, whatsoever, where the same shall be made a security for the payment of any definite and certain sum of money; * * * also any conveyance of any lands, estate or property, whatsoever, in trust to be sold or otherwise converted into money, which shall be intended only as security," etc. Hence it is seen that from an early period in the history of the national life the power has been exercised of imposing a stamp duty upon personal obligations, certificates of stock of corporations, bonds, notes, and similar securities discounted at banks, and at a later period upon similar obligations, as well as upon conveyances, leases, mortgages, broker's notes, or memoranda of sale of stock, bonds, goods, or merchandise. In all this there has been full acquiescence, and the power of the government has been so thoroughly recognized that in Knowlton v. Moore, 178 U. S. 41, 59, 20 Sup. Ct. 755, 44 L. Ed. 969, Mr. Justice White met an objection to the power of the government to lay the taxes there involved by saying:

"Conveyances, mortgages, leases, pledges, and, indeed, all property, and the contracts which arise from its ownership, are subject, more or less, to state regulation, exclusive in its nature. If the proposition here contended for be sound, such property, or dealings in relation thereto, cannot be taxed by congress, even in the form of a stamp duty. It cannot be doubted that the argument, when reduced to its essence, demonstrates its unsoundness, since it leads to the necessary conclusion that both the national and state governments are devested of those powers of taxation which from the foundation of the government, admittedly, have belonged to them."

And well might the learned justice use such vigorous expression, for stamp duties have been uniformly upheld. In Attorney General v. Insurance Co., 3 App. Cas. 1090, there is helpful discussion. The judgment of the privy council states:

"The single point to be decided upon this is whether a stamp act—an act imposing a stamp on policies, renewals, and receipts, with provisions for avoiding the policy, renewal, or receipt, in a court of law, if the stamp is not affixed—is or is not direct taxation? Now, here again we find words used which have either a technical meaning, or a general, or, as it is sometimes called, a 'popular,' meaning. One or other meaning the words must have; and, in trying to find out their meaning, we must have recourse to the usual sources of information, whether regarded as technical words, words of art, or words used in popular language. And that has been the course pursued by the court below. First of all, what is the meaning of the words as words of art? We may consider their meaning either as words used in the sense of political economy, or as words used in jurisprudence in the courts of law. Taken in either way, there is a multitude of authorities to show that such a stamp, imposed by the legislature, is not direct taxation. The political economists are all agreed. There is not a single instance produced on the other side. The number of instances cited by Mr. Justice Taschereau (in the court below) in his elaborate judgment it is not necessary here to do more than refer to. But surely, if one could have been found in favor of the appellants, it was the duty of the appellants to call their lordships' attention to it. No such case has been found. Their lordships therefore think they are warranted in assuming that no such case exists. As regards judicial interpretation, there are some English decisions and several American decisions on the subject, many of which are referred to in the judgment of Mr. Justice Taschereau. There, again, they are all one way. They all treat stamps either as indirect taxation, or as not being direct taxation."

It will now be inquired why a government that has power to lay an indirect tax upon a bond for the payment of money may not lay the same tax upon the sale; that is, the act of transferring, or (and) the contract for transferring, the bond from one holder to another. What is there so inherently different in the contracts as to enable a court to affirm the validity of the tax in one case, and to deny it in the other? Both are contracts. Both are founded upon the same presumable consideration. Both are business transactions involving a contractual relation. If A. issue his promissory note to B. for $1,000 upon receiving that sum from B., and B. agree to sell it to C., and accordingly does deliver it to C. for $1,000, upon what possible theory may the federal government place an unapportioned tax on the transaction between A. and B., and be denied the ability to place a like tax on the transaction between B. and C.? The only conceivable answer is that the premise is false, but this would deny the power of congress to lay the usual stamp tax on bills or notes. Passing to another assumption, if A., a cor-

poration, issue shares of stock to B. for $1,000 upon receipt of that sum, and B. contract to sell them to C., and accordingly does deliver them to C. for $1,000, upon what theory may the court affirm the power of the federal government to lay an unapportioned tax upon the transaction between A. and B., and deny the power to lay a like tax upon the transaction between B. and C.? Is it because A. is a corporation, and the tax is upon the corporate privilege? Does not the state give the privileges of the corporation to the stockholders, and, if the government may tax one privilege, may it not tax the other? Membership in a corporation created by the state is an artificial privilege, similar, if not equal in degree, to that in an incorporated exchange, and the benefits of incorporation are the only advantages conferred by the state in the latter case; and to the opportunities afforded in both cases the national government is an entire stranger. Again, if the federal government may lay an unapportioned tax upon indentures whereby land is conveyed, why may not a like tax be placed upon contracts for sales of stock? One class relates to the sale of land, and the other to the sales of shares. There is no intrinsic difference. If the tax is on the certificate, so it is on the land. If one transfer is given the protection flowing from registration, so is the other. If the tax shifts in one case, in which case does it shift? One contract carries the land; the other, muniments of titles to shares. It is difficult to understand why speculations or investments in stock should be exempted from, and exchanges or sales of real property exposed to, a stamp tax. It is illogical to affirm that an unapportioned tax upon one contract, for example, for the payment of money, is valid, and a tax upon a contract to sell property is invalid. Both tax an obligation,—one to pay money for property received or to be received; one to exchange property for money. Thus, by looking at the inner nature of the transactions, it is found that all have the essence of contracts, and that it is upon the contract, as embodying a business transaction, that the tax is laid. Whether, upon the sale of stock, the stamp is required to be placed upon the books of the company where the transfer is shown, on the transfer certificate, or on a memorandum of sale, the tax is upon the business or act of making a legal contract; and the basis of the power is precisely the same as that which justifies a tax upon bills, notes, or certificates of shares as originally issued, or contracts of conveyance. Congress may tax contracts in any form. It may tax contracts to buy certificates, or contracts to sell the same. As to such buying or selling, it was said in Treat v. White, 181 U. S. 264, 269, 21 Sup. Ct. 611, 613, 45 L. Ed. 853, where this very statutory provision was involved, "The power of congress in this direction is unlimited." In Knowlton v. Moore, Mr. Justice White adopted the following definition: "Direct taxes bear immediately upon persons,—upon the possession and enjoyments of rights. Indirect taxes are levied upon the happening of an event or an exchange." Thereupon it was demonstrated that an inheritance or legacy tax is laid upon the transmission of property. But what is "transmission" but the transfer of title by one person to another, vesting possession at the time

when the enjoyment of the first holder or owner ceases by the termination of his life? If the donor effected the same distribution of his property in his lifetime, would not congress have equal power to tax it? The assumed right of the federal government to lay death duties has no less remote basis than the highly theoretical and practically unknown power of the state government to seize and confiscate the property of an unoffending citizen who dies, leaving heirs or donees. But the basic theory upon which such tax rests does not change the fact that it is imposed upon the transfer of the title of the property. The state has the power to regulate the use of property, and to direct under what reasonable limitations sales thereof shall be made. As a basis of taxation, this power inures to congress quite as much as does the power to regulate successions. The conception that the state may theoretically confiscate property at the death of the owner, but may only regulate its use and sale during his life, points to a difference in degree of authority. The power of the state to regulate is a true and genuine dominion. It is constantly exercised. It furnishes some real basis for taxation. The power to appropriate a decedent's property is the merest speculation, which no civilized state would ever venture to use. The tax in question falls precisely within the definition stated by Mr. Justice White, because it relates to the act of sale, which act has two constituent elements,—an agreement to sell, and consequent delivery. The two constitute an event upon which the tax takes effect. This event is a business transaction. As such, congress has taxed it; and, as regards the power to do so, it is immaterial whether there is one event isolated, or many events aggregated, so as to constitute a person's uniform or usual vocation. It may be of inconsiderable importance whether an apportioned tax upon sales of property could be collected. Unlike a state, congress, having in view the necessities of maintenance, must fix upon a gross sum, and exactly apportion it. If this sum were laid upon the sales of property, the allotment to New York might be exceeded, while in Dakota a deficiency might arise. For the succeeding year the deficiency must necessarily be included in the gross sum to be raised, whereby it would result that under a new apportionment the amount of deficiency in Dakota would be apportioned anew to the states, and collected therefrom. Hence it would happen that the states meeting their allotment might, and probably would, make up the deficiency of others, and the very theory of apportionment would be violated. The excess in New York and the deficiency in Dakota would raise equally embarrassing questions. While the question of inconvenience or impossibility of placing a tax upon sales of property does not prove that the tax is indirect, it illustrates that it is based upon contingent events, and not upon property; and that, in the uncertainties attending it, is unlike known, direct taxes.

It is desirable to summarize the foregoing views. (1) The expressions in the cases, where no tax was valid, that a tax on vendors or occupations or shipping bills was a forbidden tax on the commodities, would, if applied to instances where the taxing power has been uniformly recognized, vitiate the same. (2) In whatever form

a tax is laid, its payment must be primarily from the taxpayer's property, and in this sense the same is the subject of the tax. (3) A statute providing for a direct tax, with certainty, burdens by lien, or generally, the taxpayer's property, and, in theory, appropriates, pro tanto, his income, and incumbers his principal, while a statute providing for a tax on sales interrupts no enjoyment of property, makes no exaction from principal or income, beyond placing a tax upon a transaction attending the disposition of property, to wit, the contract for the sale and the act of transfer; but in the present case the certificates pass unaffected to the vendee. (4) The right to tax a pursuit, occupation, or business involves the right to tax the same, in whatsoever limited degree it is adopted and followed, so that a right to tax one for carrying on the business of selling shares of stock involves the power to tax the sale of a single share of stock; that is, a tax on venders may be limited to a single instance of vending. (5) The right to lay an unapportioned tax on sales is not limited to sales of commodities, whereby the tax may be shifted, in whole or in part; and the conflicting views of the economists should influence the legislature, and not constrain the courts. (6) The history of legislation shows similar instances where, after the adoption of the constitution, the power was exercised to tax contracts for the payment of money and the transfer of property, and the genuine nature of such contracts is the same as the subject of the act in question. The validity of such taxes is illustrated by their long and uniform enforcement by the court. (7) Taxes on sales or transfers of property are indirect, within the holdings of the supreme court. (8) The fact that the tax is difficult, if not impossible, of apportionment, indicates that it is based upon contingent events, and quite unlike the tax usually conceived as direct.

The defendant's contention, seemingly, is that, in the procession of constitutional interpretation, some reason has just now appeared that should awaken the courts to a fundamental error, of which all men for a century have been profoundly unconscious. But such attention as is due the inquiry from the trial court confirms the wisdom of the past, and the power of congress to lay the tax.

The demurrer should be overruled.