**FIRST IOWA HYDRO-ELECTRIC COOP-
ERATIVE v. FEDERAL POWER COM-
MISSION (STATE OF IOWA, Intervener).**

No. 8752.

United States Court of Appeals

District of Columbia.

Decided Aug. 13, 1945.

Mr. George B. Porter, of Washington, D. C., with whom Mr. Andrew G. Haley, of Washington, D. C., was on the brief, for petitioner.

Mr. Howard E. Wahrenbrock, Assistant General Counsel, Federal Power Commission, of Washington, D. C., with whom Messrs. Charles V. Shannon, General Counsel, Willard W. Gatchell and L. W. McKernan, Principal Attorneys, Federal Power Commission, all of Washington, D. C., were on the brief, for respondent.

Mr. Neill Garrett, of Des Moines, Iowa, pro hac vice, by special leave of Court, with whom Messrs. John M. Rankin, of Des Moines, Iowa, and Horace L. Lohnes, of Washington, D. C., were on the brief, for intervenor, State of Iowa. Mr. C. Walter Harris, of Washington, D. C., also entered an appearance for State of Iowa.

Before GRONER, Chief Justice, and MILLER and ARNOLD, Associate Justices.

MILLER, Associate Justice.

Petitioner applied to the Federal Power Commission for a license to construct a power project on Cedar River in the State of Iowa. The Commission dismissed the application for the reason that, "The applicant has not presented satisfactory evidence, pursuant to Section 9(b) of the Federal Power Act,[1] of compliance with the requirements of applicable laws of the State of Iowa requiring a permit from the State Executive Council to effect the purposes of a license under the Federal Power Act * * *."

On this appeal petitioner admits that it failed to secure a permit from Iowa and contends that it would have been futile to apply for one. The general rule is that administrative remedies must be exhausted before judicial review can be availed of.[2] "One who is required to take out a license will not be heard to complain, in advance of application, that there is danger of refusal. * * * He should apply and see what happens."[3]

To escape the operation of this rule, petitioner argues, in the alternative, that: [1] no applicable Iowa law requires one in its position to secure a permit; [2] if the Iowa law[4] means what its officials.

---

[1] 16 U.S.C.A. § 802: "Each applicant for a license under this chapter shall submit to the commission * * * (b) Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purposes of a license under this chapter."

[2] Red River Broadcasting Co. v. Federal Communications Commission, 69 App.D.C. 1, 3, 98 F.2d 282, 284, and authorities cited, note 3.

[3] Highland Farms Dairy, Inc., v. Agnew, 300 U.S. 608, 616, 617, 57 S.Ct. 549, 553, 81 L.Ed. 835; see also Goldsmith v. United States Board of Tax Appeals, 270 U.S. 117, 123, 46 S.Ct. 215, 70 L.Ed. 494.

[4] The two Sections of Chapter 363 of

contend, then the law is unconstitutional, and compliance cannot be required. In support of its first proposition, petitioner says that the Iowa Code Sections relied upon by the Commission are not state laws contemplated by Section 9 (b) of the Power Act, because by their very terms the authority of the State Executive Council is limited to waters of the State; and because they do not prohibit diversion of water for *power* purposes, but only for *industrial* purposes. Conceivably, Iowa might say that its Legislature intended to speak only of waters navigable according to state classification, although not navigable under Federal classification.[5] While this is a possible interpretation and one which the State might adopt concerning the streams here involved—especially if it were necessary to do so in order to avoid the challenge of unconstitutionality—we are unable to adopt it, in the absence of a decision to that effect by the Iowa courts. Each of the disputed Sections speaks in terms of *navigable* waters. In view of the fact that both State and Federal governments may legislate concerning such waters—each in its own appropriate sphere— we see no reason to give to Chapter 363 the narrow interpretation for which petitioner contends. Again, Section 7771 makes no distinction between power projects and industrial purposes. Its reference to diversion is general rather than special; in fact, it could be just as well argued that the State Legislature was speaking, in this Section, primarily of diversion for power production. Moreover, it can hardly be seriously urged that the State Legislature was concerned over industrial pollution of its streams—because of the probable injurious effect upon public health and de-

struction of fish and other wild life—while, at the same time, unconcerned over the possible results of complete diversion of water from its streams. The reference to pollution is, in fact, secondary to the primary requirement concerning diversion; and some diversion usually occurs in connection with power projects. Neither is it reasonable to suppose that the State was concerned only with pollution of streams navigable under state classification as distinguished from other navigable streams. We conclude that the Commission properly rejected this contention.

 Petitioner's second, alternative contention challenges the Iowa law upon the ground of *unconstitutionality*. It assumes that the jurisdiction of the Federal government over navigable streams, in so far as the licensing of power projects is concerned must be exclusive in nature, requiring a uniform rule of regulation and excluding, altogether, state regulatory legislation. We conclude that this contention and the assumption upon which it is based are unsound. Where Congress, while regulating related matters, has purposely left untouched a distinctive part of a subject which is peculiarly adapted to local regulation, the state may legislate concerning such local matters which Congress could have covered but did not.[6] The fact that particular phases of an interstate activity have long been regulated by states, has been recognized as a strong reason why, in the continued absence of conflicting Congressional action, the state regulatory laws should be declared valid.[7] The same reasoning should apply where Congress, having newly decided to enter a particular field of interstate commerce, leaves un-

---

the Iowa Code (1939) here in dispute, read as follows:

Section 7767—"No dam shall be constructed, maintained, or operated in this state in any *navigable* or meandered stream for *any* purpose, or in any other stream for manufacturing or power purposes, nor shall any water be taken from such streams for industrial purposes, unless a permit has been granted by the executive council to the person, firm, corporation, or municipality constructing, maintaining, or operating the same." [Italics supplied]

Section 7771—"If it shall appear to the council that the construction, operation, or maintenance of the dam will not materially obstruct existing *navigation*, or materially affect other public rights,

will not endanger life or public health, *and any water taken from the stream in connection with the project is returned thereto at the nearest practicable place* without being materially diminished in quantity or polluted or rendered deleterious to fish life, it shall grant the permit, upon such terms and conditions as it may prescribe." [Italics supplied]

5 Shortell v. Des Moines Electric Co., 186 Iowa 469, 172 N.W. 649.

6 See Hines v. Davidowitz, 312 U.S. 52, 68, 61 S.Ct. 399, 85 L.Ed. 581, and authorities there cited.

7 United States v. South-Eastern Underwriters Association, 322 U.S. 533, 548, 549, 64 S.Ct. 1162, 88 L.Ed. 1440, Note 32.

touched regulatory state laws concerning part of the area. Where the Federal law *authorizes* state action, such action is permissible even as to matters which could otherwise be regulated only by uniform national enactments.[8]

In enacting the Federal Power Act, it was not the intention of Congress that the Federal government should occupy the field completely, or that the states should be excluded. On the contrary, the Act contemplates a dual system of control and the exercise of appropriate powers by the State, as well as by the Federal government.[9] This is the plain purpose of Section 9 (b). It is revealed, also, by other sections of the Act.[10]

Petitioner's contention—upon the ground of unconstitutionality—depends also upon the assumption that the disputed Iowa Code Sections constitute an absolute bar to its project, hence that their effect is to defeat the jurisdiction of the Federal government and the purposes of the Power Act. This contention must be rejected, also. It is the duty of courts to avoid the issue of constitutionality if the statute which is being interpreted is susceptible of any reasonable interpretation consistent with constitutionality.[11] All parties agree that Iowa's courts have not, so far, been faced with this issue. We see several possible interpretations of the disputed Sections which would avoid the issue. For example, upon application properly made to it, the Executive Council might find the "nearest practicable place,"[12] at which the water which is to be diverted for petitioner's project can be returned, is the point at which petitioner proposes to return it; or, perhaps, it might adopt petitioner's suggested interpretation that Chapter 363 has no application to navigable waters of the United States. Again, it will be noted that Section 7771 is so phrased as to vest large discretion in the Executive Council. The next succeeding Section, 7772,[13] is phrased in negative terms: "No permit shall be granted * * *." Evidently the Legislature intended that failure to secure a certificate of the State Department of Health should bar the issuance of a permit. The contrast between the two Sections is striking. While no departure from the requirements of the second is permissible, it is entirely within the range of probability that a court would so interpret the first Section as to allow the issuance of a permit without strict compliance with all its terms; especially if it were necessary to do so in order to avoid unconstitutionality.[14] In any event, as the Power Act places upon petitioner the affirmative duty of showing compliance with state laws, it must assume their constitutionality, make its application for a permit and pursue such remedies as may be available in the state, to establish its right to issuance of the permit. Until it has done so, it is in no position to challenge an order of the Commission, which is based upon its failure to do so.

On this appeal the Commission argues that the Iowa statute is invalid.[15] It does so,

---

[8] Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 155, 62 S.Ct. 491, 86 L. Ed. 754, and authorities there cited.

[9] United States v. Appalachian Electric Power Co., 311 U.S. 377, 428, 429, 61 S.Ct. 291, 85 L.Ed. 243; Alabama Power Co. v. Federal Power Commission, 75 U.S.App.D.C. 315, 320, 128 F.2d 280, 285; Safe Harbor Water Power Corporation v. Federal Power Commission, 3 Cir., 124 F.2d 800, 806, 807.

[10] Sections 4 (c), 4 (f), 7 (a), 10 (e), 14, 19, 20, 27, 16 U.S.C.A. §§ 797 (c), 797 (f), 800 (a), 803 (e), 807, 812, 813, 821.

[11] Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598, and authorities cited; Buttfield v. Stranahan, 192 U.S. 470, 492, 24 S.Ct. 349, 48 L.Ed. 525; Nicol v. Ames, 173 U.S. 509, 514, 19 S.Ct. 522, 43 L.Ed. 786; United States v. Gettysburg Electric Railway Co., 160 U.S. 668, 680, 16 S.Ct. 427,

40 L.Ed. 576; Lewis Publishing Co. v. Morgan, 229 U.S. 288, 311, 33 S.Ct. 867, 57 L.Ed. 1190.

[12] See Iowa Code (1939) c. 363, § 7771.

[13] Iowa Code (1939) c. 363, § 7772: "No permit shall be granted for the construction or operation of a dam where the water is to be used for manufacturing purposes, except to develop power, until a certificate of the state department of health has been filed with the council showing its approval of the use of the water for the purposes specified in the application."

[14] Cf. Nicol v. Ames, 173 U.S. 509, 514 et seq., 19 S.Ct. 522, 43 L.Ed. 786; Buttfield v. Stranahan, 192 U.S. 470, 492 et seq., 24 S.Ct. 349, 48 L.Ed. 525; Consumers Union of United States v. Walker, 79 U.S.App.D.C. 229, 231, 145 F.2d 33, 35.

[15] The Commission's position, as set out in its brief, is that the sole basis of its dismissal order was its finding that

however, not on petitioner's theory that Iowa invaded, or continued to occupy, an area absolutely prohibited to it by the Constitution, but rather that Congress, having elected to exercise, in part, the power delegated by the Commerce Clause, excluded the states from the area, proportionately to its exercise of power. It says, specifically, that the disputed Code Sections conflicted with the Power Act and were superseded by it; [16] that to require petitioner's compliance with Chapter 363 of the Iowa Code would oust the United States of jurisdiction and defeat the primary objectives of the Power Act.[17]

The question thus presented is a difficult one. On the one hand, it is necessary that full scope shall be given to the Power Act in order that its beneficent purposes may be achieved in the expansion of our national economic life.[18] On the other hand, the established interests of the states and of their citizens must be protected and preserved so far as is possible,[19] in accommodating the one to the other. To answer the question, we are required to enter an area of controversy to which the Supreme Court has referred as "the wide range of possible disagreement between Nation and state in the functioning of the Federal Power Act." [20]

The best we can do, under the circumstances, is to apply the standards which have been used by the Supreme

petitioner had failed to submit satisfactory evidence of compliance; but that Section 9 (b) of the Power Act does not require compliance with an invalid state law (United States v. Bellingham Bay Boom Company, 176 U.S. 211, 217, 218, 20 S.Ct. 343, 44 L.Ed. 437); that the lawfulness of its order depends upon the validity of the Iowa law, which was assumed by it because, as an administrative agency, it was without power to make a judicial determination of the question, or to disregard the presumption of validity of such laws. Davies Warehouse Co. v. Bowles, 321 U.S. 144, 153, 64 S.Ct. 474, 88 L.Ed. 635.

[16] See Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581; Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 786, 62 S.Ct. 491, 86 L.Ed. 754.

[17] 56 Cong.Rec. 9109 (1918), Congressman LaFollette, speaking on behalf of the Bill, said: "This, Mr. Chairman, brings me back to my first premise: That we should understand the genesis of this legislation; the reason for its coming into being and need for its enactment. We have for many years been trying to develop more or less power from rushing or falling water in many States of the Union, and many power possibilities would have long ago been developed and be giving service to man if it were not for a divided authority. While the right of water control and the ownership and jurisdiction of bed and banks of our watercourses are admittedly in the States, the jurisdiction over the navigation of all streams being in the Government the States could not well pass laws conferring upon private individuals rights to build dams across the streams, because the Government could intervene and stop proceedings under the plea of control of navigation. It is true that some of the States have granted

such rights, and dams have been built, and their legality upheld by the courts, and there have been many interesting questions raised and decisions rendered; but time forbids my going into that phase of this question. Building dams and developing water powers is usually a hazardous and costly undertaking. Men will not engage in it on uncertainties. Consequently with indefiniteness of tenure and occupation created by dual or divided authority but little development has been made. * * * This bill is brought here because it is apparent that we can get no development under a divided authority, and development is needed. Our not having greater development is inexcusable on any other ground than lack of grasp of the situation and inability to cope with it. This bill is not based on either the Government's ownership or its sovereign authority, but on the hypothesis that we as representatives of the States have authority to act for the States in matters of this character and pass laws for the general good, by the establishment of a limited trusteeship or commission composed of officials of the Government, to carry out and administer this law in such a way as not to infringe any of the rights of the States nor to impede or restrict navigation, but rather to benefit it."

[18] Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487.

[19] Colorado v. Kansas, 320 U.S. 383, 392, 64 S.Ct. 176, 88 L.Ed. 116; Nebraska v. Wyoming, 65 S.Ct. 1332.

[20] United States v. Appalachian Electric Power Co., 311 U.S. 377, 423, 61 S.Ct. 291, 306, 85 L.Ed. 243: "The briefs and arguments at the bar have marshaled reasons and precedents to cover the wide range of possible disagreement between Nation and state in the

Court, in analogous cases. Summarized briefly, the generally applicable principles are as follows: [1] When the question is whether a Federal act—within admitted Federal authority—overrides a state law, the rule is clear that state action may be excluded by clear implication or inconsistency,[21] just as well as by express language. In answering the question, however, the entire scheme of the statute must be considered.[22] [2] The expression of a purpose to limit the exertion of state power in some respects strongly suggests that Congress intended not otherwise to trammel the exercise of state power, in the same area.[23] [3] When the prohibition of state action is not specific but merely inferable from the scope and purpose of the Federal legislation, it must be clear that the Federal provisions are inconsistent with those of the state to justify the thwarting of state regulation.[24] [4] Congressional intention to displace local laws in the exercise of the commerce power is not, in general, to be inferred unless clearly indicated by considerations which are persuasive of the statutory purpose.[25] [5] In ascertaining the scope of such legislation, a proper adjustment of the local and national interests must be, always, in the background[26] To this end the primary test to be applied is not the mechanical one of whether the particular activity af- fected by the state law is part of inter- state commerce, or the arbitrary one of whether the Federal legislation can be stretched to cover a particular project, but, rather, whether the over-all, competing demands of the state and national inter- ests involved can be accommodated.[27] [6] The interest of the state in securing com- pliance with its statutes must be balanced against the effect of such control on inter- state commerce in its national aspect.[28]

■ Absorption of state authority is, nec- essarily, a delicate exercise of legislative policy to achieve a wise adjustment be- tween the needs of central control and the maintenance of strong local institutions.[29]

■ Where a Federal agency is authorized to invoke an overriding Federal power, ex- cept in certain prescribed situations, and then to leave the problem to traditional state control, the existence of Federal au- thority to act should appear affirmatively and not rest on inference alone.[30] This rule is applicable to the Federal Power Commission.[31]

■ Sometimes it is the purpose of Congress, in enacting legislation for the regulation of interstate commerce, to strengthen and assist state control and regulation, rather than to impair or di- minish it.[32] The legislative history of the Federal Power Act reveals such an inten-

functioning of the Federal Power Act. To predetermine, even in the limited field of water power, the rights of different sovereignties, pregnant with future con- troversies, is beyond the judicial function. The courts deal with concrete legal is- sues, presented in actual cases, not ab- stractions. The possibility of other uses of the coercive power of license, if it is here upheld, is not before us. We deem the pictured extremes irrelevant save as possibilities for consideration in determining the present question of the validity of the challenged license provi- sions. To this we limit this portion of our decision."

[21] Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 157, 786, 62 S.Ct. 491, 86 L. Ed. 754.

[22] Savage v. Jones, 225 U.S. 501, 533, 32 S.Ct. 715, 56 L.Ed. 1182.

[23] Mintz v. Baldwin, 289 U.S. 346, 351, 53 S.Ct. 611, 77 L.Ed. 1245.

[24] Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 156, 786, 62 S.Ct. 491, 86 L.Ed. 754, and authorities there cited.

[25] Maurer v. Hamilton, 309 U.S. 598, 614, 60 S.Ct. 726, 84 L.Ed. 969, 135 A.L. R. 1347.

[26] Federal Trade Commission v. Bunte Brothers, Inc., 312 U.S. 349, 351, 61 S.Ct. 580, 85 L.Ed. 881.

[27] United States v. South-Eastern Un- derwriters Association, 322 U.S. 533, 548, 64 S.Ct. 1162, 88 L.Ed. 1440, and note 31.

[28] Illinois Natural Gas Co. v. Central Illinois Public Service Co., 314 U.S. 498, 506, 62 S.Ct. 384, 86 L.Ed. 371.

[29] Palmer v. Massachusetts, 308 U.S. 79, 84, 60 S.Ct. 34, 37, 84 L.Ed. 93: "There- fore, in construing legislation this court has disfavored in-roads by implication on state authority and resolutely confined re- strictions upon the traditional power of states to regulate their local transporta- tion to the plain mandate of Congress."

[30] Yonkers v. United States, 320 U.S. 685, 692, 64 S.Ct. 327, 88 L.Ed. 400.

[31] Connecticut Light & Power Co. v. Federal Power Commission, 65 S.Ct. 749.

[32] Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 610, 64 S. Ct. 281, 88 L.Ed. 333.

tion.[33] Consequently, we should not find in it contrary radiations, beyond the obvious meaning of its language, unless otherwise its major purpose would be defeated.[34]

■ The licensing authority of the Commission is broadly stated in the Power Act to cover projects which are "best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of waterpower development, and for other beneficial public uses, including recreational purposes; * * *".[35] To the extent that a state law places *any* obstacle in the way of that broad objective it may be said to conflict with the Power Act. But that is not enough to show that the state law has been superseded. The Commission recognizes that the Act limits its powers in some respects; that by express limitation the Act "saves" some state laws from supersedure. Its theory may be summarized as follows: [1] In enacting the Power Act, Congress assumed that the usual rules as to supersedure would apply to state laws; [2] accordingly, it was necessary to include in the Act explicit provisions to "save" those state laws which Congress wanted to leave in effect; [3] thus, Section 27 specifically provided that nothing in the Act "shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating *to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses* * * *." [Italics supplied]; [4] in contrast, Section 9 (b) of the Act merely provides for the submission of information to the Commission by an applicant for a license, i.e., satisfactory evidence that it has complied with the requirements of state laws "with respect to bed and banks and to the appropriation, *diversion*, and use of water for power purposes * * *." [Italics supplied]; [5] accordingly, Section 9 (b) does not indicate any Congressional intention to "save" a state law which would otherwise be superseded by the Federal Power Act because in conflict with the objectives of the Act.

■ We cannot agree with the Commission's conclusion as to the effect of Section 9 (b). This Section is the one which expresses the major intention of Congress that the States and the National Government shall participate jointly in the development and regulation of water power projects. It just as effectively "saves" state laws "with respect to bed and banks [of streams] and [with respect] to the appropriation, diversion, and use of water for power purposes" as does Section 27 with respect to laws "relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses." [36] Any other interpreta-

---

[33] Jersey Central Power & Light Co. v. Federal Power Commission, 319 U.S. 61, 76, 63 S.Ct. 953, 87 L.Ed. 1258.

[34] See Federal Trade Commission v. Bunte Brothers, Inc., 312 U.S. 349, 351, 61 S.Ct. 580, 85 L.Ed. 881.

[35] Federal Power Act § 10(a), 16 U.S. C.A. § 803(a); See also § 7(a), 16 U.S. C.A. § 800(a): "In issuing preliminary permits hereunder or licenses where no preliminary permit has been issued and in issuing licenses to new licensees under section 15 hereof the Commission shall give preference to applications therefor by States and municipalities, provided the plans for the same are deemed by the Commission equally well adapted, or shall within a reasonable time to be fixed by the Commission be made equally well adapted, to conserve and utilize in the public interest the water resources of the region; and as between other applicants, the Commission may give preference to the applicant the plans of which it finds and determines are best adapted to develop, conserve, and utilize in the public interest the water re-

sources of the region, if it be satisfied as to the ability of the applicant to carry out such plans." See generally § 4, 16 U.S. C.A. § 797.

[36] The bill (S. 1419) as it passed the Senate contained this provision: "* * * before the permit shall be granted under this act, the permittee must first obtain, in such manner as may be required by the laws of the States, the consent of the State or States in which the dam or other structure for the development of water power *is proposed to be constructed.*"

The Senate bill was rejected by the House but the substitute House bill (H. R. 8716) as it was reported by the committee provided that an applicant for a license should submit to the proposed commission: "Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and dis-

tion would lead to unjust, if not absurd, results.[37]

 In recognizing and safeguarding the concurrent interest of the states in hydroelectric developments, it was not the purpose of Congress to require their consent to the construction and operation of such projects, or to give, to the states, a veto power over them. The Federal Power Act contemplates cooperative action toward a common, beneficial end. There is no reason—revealed in the Act or otherwise—why states in which water is used primarily for irrigation should stand in any different relation to the National Government, in this respect, than states in which water is used primarily for other purposes. Consequently, if one state should, under the title of irrigation laws, provide, arbitrarily, that no Federal water power project could be constructed or operated within its boundaries, that law would be just as fatally inconsistent with the Federal Power Act as would a similar enactment, in any other state, under any other title. On the other hand, it was not the purpose of Congress that the Commission should ride roughshod over any state, whatever the nature of its water laws, or give to a private corporation, licensed by it, the plenary power of eminent domain,[38] unless that corporation had first subjected itself to the state controls which protect the rights, powers, privileges and immunities of its other citizens. Carrying petitioner's argument to its logical conclusion, it would follow that if the Commission could be persuaded to make appropriate findings, a licensee might, by so specifying in its application, take over the State House for its headquarters office or flood the capital city for a storage basin.[39]

tributing power and in any other business necessary to effect the purposes of a license under this Act."

Section 9(b) was amended to its present form by the House upon motion of Representative LaFollette, who, speaking on behalf of his amendment, said: "Mr. Chairman, in this section, by the provision that the applicant for a license shall have complied with the rules and laws of the State in regard to the diversion of water, we are trying not to infringe the rights of the States in that respect, and I wish to call the attention of the committee to the fact that many Supreme Court decisions in respect to States' rights as to water also refer to States' rights as to the beds and banks, and I would like to read from the latest United States Supreme Court decision upon this question, delivered on May 12, 1917. The opinion was delivered by Mr. Justice Pitney, and in that he says: 'The States have authority to establish for themselves such rules of property as they may deem expedient with respect to the streams of water within their borders, both navigable and nonnavigable, and the ownership of the lands forming their beds and banks.' In many States the law gives the riparian owner title to the middle of the stream. In other States only to the high-water mark. The property rights are within the State. It can dispose of the beds, or parts of them, regardless of the riparian ownership of the banks, if it desires to, and that has been done in some States. If we put in this language, which is practically taken from that Supreme Court decision, as to the property rights of the States as to the bed and the banks and to the diversion of the water, then it is sure that we have not infringed any of the rights of the States in that respect, or any of their rules of property * * *." 56 Cong.Rec. 9810 (1918).

[37] Cf. Consumers Union of United States v. Walker, 79 U.S.App.D.C. 229, 231, 145 F.2d 33, 35, and authorities cited.

[38] Federal Power Act § 21, 16 U.S.C.A. § 814: "When any licensee cannot acquire by contract or pledges an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in conjunction with an improvement which in the judgment of the commission is desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, it may acquire the same by the exercise of the right of eminent domain * * *."

[39] United States v. Southern Power Co., 4 Cir., 31 F.2d 852, 856: "While it is well settled that land devoted to a public use may be taken for another public use under the power of eminent domain, it is equally well settled that this may not be done, unless the intention of the Legislature to that effect has been manifested in express terms or by necessary implication. * * * It is true that this rule is ordinarily applied in grants of power to public service corporations, and not where the power is being exercised by the state itself for its immediate purposes. * * * But it is based, not upon any lack of power upon the part of the government, but upon the presumed intention of the Legislature, and should be held to apply in condemnation proceedings, even by the state itself, where the prior public use could not

In this connection the intervenor calls to our attention, as an additional reason for upholding the Commission's order, Section 7796 of the Iowa Code which reads as follows: "Whenever the erection of any such dam will affect highways or state-owned lands, the applicant shall as a condition precedent secure a permit from the board, commission, or other official body charged with jurisdiction over and control of said highways or state-owned lands." The intervenor says, and petitioner does not deny, that as shown in the descriptive statement of the proposed project submitted to the Power Commission, many portions of the United States and State primary highways will be flooded; that, in the event the project is constructed, those highways will have to be rerouted and reconstructed; that petitioner admits it has made no application for the permit required by Section 7796.[40] Nothing appears in the record to excuse petitioner's failure to comply with Section 7796. For this reason alone, therefore, the Commission's order must stand.

But apart from Section 7796, and considering only the two Sections upon which appellant and appellee have made the case to turn, Sections 7767 and 7771, we conclude that the area of law covered thereby is so obviously within the domain of the state's power that Congressional intention, to supersede the disputed state laws, must much more clearly appear[41] than it does in the Power Act. The maintenance of running streams, the preservation of wildlife, the rights of riparian owners, long-established land titles,[42] drainage, sewage and industrial waste disposal; these and many other problems of public health and public policy are involved. These are problems which should be worked out by diplomatic adjustment of state and national interests.[43] The Commission's licensee should be an agent toward this end, rather than an

reasonably interfere with the purpose for which condemnation is authorized." The right of eminent domain is a sovereign one inherent in the Federal Government and may be exercised without the consent of a state: Kohl v. United States, 91 U. S. 367, 23 L.Ed. 449; Chappell v. United States, 160 U.S. 499, 510, 16 S.Ct. 397, 40 L.Ed. 510. The fact that land within the state is already devoted to a public use does not limit the Federal Government's power to condemn: United States v. Gettysburg Electric Railway Co., 160 U.S. 668, 681, 16 S.Ct. 427, 40 L.Ed. 576. It may condemn public property held in a governmental or proprietary capacity by the states or their instrumentalities: Jefferson County, Tenn., v. Tennessee Valley Authority, 6 Cir., 146 F.2d 564 (roads and highways); United States v. Town of Nahant, 1 Cir., 153 F. 520 (sewers and water pipes); United States v. 4,450.72 Acres of Land, D.C.Minn., 27 F.Supp. 167 (state game preserve); State of Missouri v. Union Electric Light & Power Co., D.C.C.D. Mo., 42 F.2d 692 (land occupied by county courthouse and jail); United States v. Jotham Bixby Co., D.C.S.D.Cal., 55 F.2d 317, affirmed sub nom., C. M. Patten & Co. v. United States, 9 Cir., 61 F.2d 970, dismissed as moot 289 U.S. 705, 53 S.Ct. 687, 77 L.Ed. 1462 (municipal park); Stockton v. Baltimore & N. Y. R. Co., C.C.D.N.J., 32 F. 9, 19, 20, appeal dismissed, 140 U. S. 699, 11 S.Ct. 1028, 35 L.Ed. 603 (tide lands held by state in trust for public); Town of Bedford v. United States, 1 Cir., 23 F.2d 453, 56 A.L.R. 360 (road); Georgia v. Chattanooga, 264 U.S. 472, 44 S. Ct. 369, 68 L.Ed. 796 (state owned railroad property in another state).

[40] Maurer v. Hamilton, 309 U.S. 598, 614, 60 S.Ct. 726, 84 L.Ed. 969, 135 A. L.R. 1347.

[41] See Florida v. United States, 282 U.S. 194, 211, 212, 51 S.Ct. 119, 75 L.Ed. 291.

[42] Hardin v. Jordan, 140 U.S. 371, 380, 381, 11 S.Ct. 808, 838, 35 L.Ed. 428; Speech of Representative LaFollette, speaking on section 9(b), 56 Cong.Rec. 9810 (1918), supra, note 36.

[43] Parker v. Brown, 317 U.S. 341, 362, 363, 63 S.Ct. 307, 319, 87 L.Ed. 315: "When Congress has not exerted its power under the Commerce Clause, and state regulation of matters of local concern is so related to interstate commerce that it also operates as a regulation of that commerce, the reconciliation of the power thus granted with that reserved to the state is to be attained by the accommodation of the competing demands of the state and national interests involved. * * * Such regulations by the state are to be sustained, not because they are 'indirect' rather than 'direct', * * * not because they control interstate activities in such a manner as only to affect the commerce rather than to command its operations. But they are to be upheld because upon a consideration of all the relevant facts and circumstances it appears that the matter is one which may appropriately be regulated in the interest of the safety, health and well-being of local communities, and which, because of its local character and the practical difficulties involved, may never be adequately dealt with by Congress. Because

antagonist of the state and its other citizens.

It may be noted in passing that we are not concerned in this case with a situation in which Congress has elected to exercise the full power delegated by the Constitution.[44] The present case involves no more than the expressly limited powers of a government agency to license a private corporation which seeks to operate under the restrictive provisions of the Power Act. Needless to say, no findings or decision of the Commission could enlarge the scope of the Act or increase the Commission's power under it. It would serve no useful purpose, for example, to produce electric power—thus carrying out the beneficent objective of the Federal Power Act—if by so doing the community to be served with electricity were turned into a barren, unpopulated waste. Again, if the result of constructing a power project were to strip one state of its water in order to serve the needs of another, it would require convincing evidence of legislative intention to justify it. If Congress wished to produce such results it would speak clearly and unmistakably. On the contrary, it has required an applicant to show that he has complied with the state laws. We think it meant compliance, not information that he has failed to comply.

A situation closely analogous to that of the present case may be found in Maurer v. Hamilton [45] where the Supreme Court was required to reconcile or strike down a Pennsylvania law whose purpose was to protect its people and its highways. It chose the former alternative. That case involved the Federal Motor Carrier Act [46] which, in Section 204, conferred upon the Interstate Commerce Commission authority to regulate "safety of operation and equipment" of motor vehicles used by carriers in interstate commerce. Section 225 of that Act reserved to the states power to regulate "sizes and weight" of motor vehicles. It was contended that the Pennsylvania statute, which prohibited the operation over its highways of any motor vehicle carrying any other vehicle over the head of the operator of such carrier vehicle, was superseded by rules and regulations promulgated by the Commission under the Motor Carrier Act. The Interstate Commerce Commission had interpreted the law in such manner as to permit such carriage. The Pennsylvania law constituted an insurmountable obstacle to it. The Supreme Court held there was no supersedure.[47] The test, then, is not whether a state law happens to block action which a Federal agency may chance to approve. Instead, it is whether the

---

of its local character also there may be wide scope for local regulation without substantially impairing the national interest in the regulation of commerce by a single authority and without materially obstructing the free flow of commerce, which were the principal objects sought to be secured by the Commerce Clause."

44 Cf. Kohl v. United States, 91 U.S. 367, 374, 23 L.Ed. 449; United States ex rel. Tennessee Valley Authority v. Powelson. 319 U.S. 266, 279, 63 S.Ct. 1047, 87 L.Ed. 1390; Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 154–156, 786, 62 S. Ct. 491, 86 L.Ed. 754 and authorities cited; see Collins v. Yosemite Park & Curry Co., 304 U.S. 518, 530, 58 S.Ct. 1009, 82 L.Ed. 1502; Silas Mason Co. v. Tax Commission of Washington, 302 U.S. 186, 203, 58 S.Ct. 233, 82 L.Ed. 187; James v. Dravo Contracting Co., 302 U.S. 134, 147, 58 S.Ct. 208, 82 L.Ed. 155, 114 A. L.R. 318.

45 309 U.S. 598, 60 S.Ct. 726, 84 L.Ed. 969, 135 A.L.R. 1347.

46 49 Stat. 543 (1935), 49 U.S.C.A. §§ 301–327.

47 Maurer v. Hamilton, 309 U.S. 598, 610, 611, 60 S.Ct. 726, 732, 84 L.Ed. 969, 135 A.L.R. 1347: "But the question re-

mains whether the Pennsylvania statute is a regulation of 'sizes and weight' within the meaning of § 225, or whether it is a regulation of 'safety of operation and equipment', which the Commission was authorized to make by § 204(a) (1) (2). Perusal of the present record can leave no doubt that in both a technical and a practical sense § 1033(c) is a regulation of weight and size of the loaded motor vehicle, and that the Pennsylvania Legislature intended it to be such. By providing that the carried car shall not be loaded above the cab, the statute sets practical limits to the height of the loaded car and precludes its projection beyond the cab of the carrier car and into the line of vision of its driver. It is also a restriction on weight distribution of the loaded car and in its amended form specifically prohibits placing the 'weight' of the carried car above the driver. The highest court of the state has declared that such are the purposes of subsection (c), in order to avoid the safety hazards resulting from improper weight distribution and the height of the carried car at a point where it cannot be observed by the driver. As interpreted and applied by the state court, we can not regard the regulation as other than an exercise of the state's

state law frustrates the operation of the Federal law, prevents accomplishment of its purpose, refuses to its provisions their natural effect;[48] whether, in short, the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.[49] If it does, then it must yield. We conclude that no such showing has been made in the present case. The Commission, prop-

erly, insisted upon a good faith effort, by its applicant, to comply with the state law.

Affirmed.

Mr. Justice ARNOLD sat during the argument of this case; concurred in the result reached in this opinion, but resigned from the Court before the opinion was completed.

---

power to protect the safe and convenient use of its highways through the control of size and weight of motor vehicles passing over them, which it was the purpose of § 225 to reserve to the state from the grant of regulatory power to the Commission. Being thus reserved we think it is unaffected by the authority conferred on the Commission by § 204 to regulate 'safety of operation and equipment.' "

[48] Savage v. Jones, 225 U.S. 501, 533, 32 S.Ct. 715, 56 L.Ed. 1182; Asakura v. Seattle, 265 U.S. 332, 44 S.Ct. 515, 634, 68 L.Ed. 1041; Hines v. Davidowitz, 312 U. S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581.

[49] Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581; Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 157, 786, 62 S.Ct. 491, 86 L.Ed. 754; cf. Hill v. Florida, 65 S.Ct. 1373.