The ATCHISON, TOPEKA AND SANTA
FE RAILWAY COMPANY et al.,
Plaintiffs,

v.

CITY OF CHICAGO, a Municipal Corpo-
ration, et al., Defendants,
and
Parmalee Transportation Company,
Defendant-Intervenor.

No. 55 C 1883.

United States District Court
N. D. Illinois, E. D.

Dec. 12, 1955.

As Amended by Supplemental
Opinion Jan. 12, 1956.

Benjamin F. Goldstein and Albert J. Meserow, Chicago, Ill., for Railroad Transfer Service, Inc.

Amos M. Mathew, Chicago, Ill., and Benjamin F. Goldstein, for railroads.

John C. Melaniphy, Acting Corp. Counsel, Chicago, Ill., for City of Chicago.

Lee A. Freeman, Chicago, Ill., for Parmalee Transp. Co.

LA BUY, District Judge.

The above cause is before the court on two motions: (1) a motion for summary judgment filed on behalf of the City of Chicago, and (2) a motion for temporary injunction filed by the plaintiffs.

These motions are based on the plaintiffs' complaint for declaratory judgment, together with the documents and exhibits attached thereto; on affidavits and exhibits submitted by the plaintiffs and the defendant-intervenor; and hearings had before the court. No answers have been filed to the complaint by either the City of Chicago or Parmalee, although Parmalee's petition for intervention prays that it be considered as an "answer and claim".

In the present state of the record, therefore, the court must refer to the complaint and the petition with respect to the issues which are here presented.

Jurisdiction is premised on § 1331 of the Judicial Code, 28 U.S.C.A., granting to district courts original jurisdiction of civil actions which arise under the Constitution, laws and treaties of the United States and where the matter in controversy exceeds the sum of $3,000 exclusive of interest and costs, and also on § 1337 of the Judicial Code, 28 U.S.C.A., granting to district courts original jurisdiction of civil actions arising under any act of Congress regulating commerce.

The complaint alleges that plaintiff railroads have filed tariffs with the In-

terstate Commerce Commission and the Illinois Commerce Commission for through passenger service from points outside of Chicago to points beyond Chicago; that there is a contract between the plaintiff railroads and the plaintiff, Transfer, whereby Transfer carries railroad passengers and their baggage from one Chicago terminal station to another; that before commencing his rail journey the passenger has purchased a through ticket to and beyond Chicago in which is included a coupon good for transportation between the Chicago terminal stations in Transfer's vehicles; that the coupon is surrendered by the passenger when he uses Transfer's vehicles; that the railroad pays Transfer the coupon rate fixed in the contract and the entire expense of the transfer operation is absorbed by the railroads; that more than 99% of all such through passenger service is in interstate commerce; that the power to regulate the manner in which the railroads shall carry out their responsibilities under § 1(3) (a), 1(4) and § 3(4) of the Interstate Commerce Act, 49 U.S.C.A., is exclusively vested in the Interstate Commerce Commission and the ordinance is invalid as encroaching upon powers vesting exclusive regulation of this activity in the Interstate Commerce Commission pursuant to "An act to regulate commerce", 49 U.S.C.A. § 1 et seq.; that in the alternative the ordinance is invalid as an undue burden on interstate commerce in violation of Article 1, § 8, Clause 3 of the Constitution of the United States for the reason that § 28–31 of the Municipal Ordinance premises the issuance of a license to terminal vehicles upon public convenience and necessity as determined by the commissioner and upon report to the council which latter body may fix the maximum number of terminal vehicle licenses to be issued not to exceed the number recommended by the commissioner; that the proper exercise of this power by the Commissioner and the City Council requires, as a minimum, the knowledge of all factors which influence the demand for and supply of suitable passenger vehicles and all the pertinent facts and circumstances in the operation of the railroads which influence the volume of through passengers traveling through Chicago; that practically none of these pertinent facts and circumstances are available to the commissioner and/or city council and the criteria prescribed by § 28.21–1 of the ordinance do not and can not make such pertinent information available to them; that § 28–6 of the ordinance confers sole discretion upon the commissioner to select the class of persons and individuals "qualified" to have public passenger vehicle licenses thereby limiting the number and character of passenger motor vehicles and the number and qualifications of the operators available to the railroads to perform the interstate transfer service they are required by law to provide.

The complaint also alleges that plaintiffs have advised the defendant, City of Chicago, and its officials that the provisions of the ordinance do not apply to the operations covered by contract between the plaintiff railroads and the plaintiff, Transfer, for the reason, (1) the ordinance specifically excepts from its regulation public passenger vehicles which are used in the operation of a public utility under the laws of Illinois; that the railroads which are engaged in the transportation of persons are public utilities within Chapter 111⅔, § 1 et seq., Smith-Hurd Ann.Stats., and that the motor vehicles of Transfer are operated as exclusive agents for said railroads providing the service covered by the public utility law of Illinois; that each of the motor vehicles of Transfer are therefore excepted; and (2) Transfer's passenger vehicle is not intended by the ordinance to be a "terminal vehicle" as defined thereunder in view of the various amendments incorporating changes in that definition and also in the application thereof under earlier ordinances.

█ The defendant, City of Chicago, has filed a motion for summary judgment requesting the court to determine as a matter of law whether Chapter 28 of the Municipal Code applies to the operations

of the plaintiff, Railroad Transfer Service, Inc. It is a cardinal rule that such motions are granted only in cases where there is no genuine issue of fact involved and where the moving party is entitled to judgment as a matter of law.

The petition for intervention, considered as an answer, does not dispute any of the factual allegations of the complaint. In addition, Parmalee in oral argument has admitted that the transportation here involved is in interstate commerce. Parmalee does, however, contend that a dispute exists as to a material fact in that plaintiff railroads state they are required to provide through passenger transportation under the tariffs filed and the applicable statute, whereas Parmalee disagrees. While a dispute does, therefore, exist as to the effect of these tariffs and as to the requirements of the statute regarding through transportation, the court is of the opinion it is not a dispute as to a material fact but a disagreement as to the effect of these tariffs and the interpretation of the statute. This presents only a question of law.

Defendant, City of Chicago, not having filed an answer and having instead filed a motion for summary judgment solely on the basis of the complaint, must be considered to have admitted the truth of the facts alleged therein.

The court is of the opinion that a study of the pleadings, documents and exhibits does not reveal the existence of a dispute as to any of the material facts presented in the complaint. Also, it is not disputed that the transfer operation between railroad terminals is railroad transportation not subject to Part II of the Interstate Commerce Act except for its provisions for Commission regulation "relative to qualifications and maximum hours of service of employees and safety of operations and equipment"; and that Transfer is not a carrier or railroad under Part I of the Interstate Commerce Act.

A federal court has jurisdiction to enjoin the enforcement of statutes which are not authorized as an exercise of police power and which constitute an unlawful burden on interstate commerce. But the power to declare legislative enactments void is one that is exercised cautiously and with reluctance. The presumption is always in favor of the validity of such acts, and the burden of overcoming this strong presumption rests upon the one who challenges it.

The area within which Congress has exercised the power granted to it by the Constitution and the province within which the states have been permitted to encroach thereon by virtue of their police powers has been the subject of controversy in many cases for many years. The guides in judging the validity of state legislation with regard to the exercise of its police powers are discussed in First Iowa Hydro-Elec. Coop. v. Federal Power Comm., 1945, 80 U.S. App.D.C. 211, 151 F.2d 20, 26, and First Nat. Ben. Soc. v. Garrison, D.C.1945, 58 F.Supp. 972, 983–985. They are (1) when state and local laws are in conflict with an act of Congress, the law of Congress prevails; (2) when an act of Congress does not clearly prohibit state action but such prohibition is inferable from the scope and purpose of federal legislation, it must be clear that the state legislation is inconsistent with that of Congress in order to render it invalid; (3) when Congress has circumscribed its regulation of interstate commerce to a limited field the intent to supersede the exercise of police power by the state is not implied as to matters not covered by federal legislation; (4) when a state has enacted laws under its police power although they affect interstate commerce, such laws may stand until Congress takes possession of the field under its superior authority to regulate such commerce, but such federal action must be specific in order to be paramount; and (5) Congressional supersedure of local laws is not to be inferred unless clearly indicated by considerations which are persuasive of its intent to do so.

The police power of a state may be delegated to the various munici-

palities throughout the state, and where such delegation has been made, a municipality, acting as an arm of the state, has power and discretion in passing laws in the public interest. Under Chapter 24, § 23–51, Cities & Villages Act, Smith-Hurd Ann.Stats., the State of Illinois has delegated to the City of Chicago and other municipalities, the power

> "To license, tax, and regulate hackmen, draymen, omnibus drivers, carters, cabmen, porters, expressmen, and all others pursuing like occupations, and to prescribe their compensation."

The right and power of the city to regulate the use of its streets by motor vehicles includes the right to impose reasonable conditions and restrictions to promote the general welfare. And, in accord with the general propositions stated above, such regulation where obviously intended as a police regulation, and not operating unreasonably beyond the occasions of its enactment, is not invalid simply because it may incidentally affect the exercise of some right granted by Congress.

 In connection with the application of federal legislation and supervision over the particular activity involved here, it is to be kept in mind that Congress will not be deemed to have superseded or excluded state action under the commerce clause until its intention to do so has been made definite and clear, and where Congress while regulating related matters has not acted on a subject which is peculiarly adapted to local regulation, the state may exert authority concerning such local matters although they indirectly burden interstate commerce. The Interstate Commerce Commission under the authority granted by Congress has not undertaken to exercise any supervision over the specific services performed by Transfer and neither has Congress indicated a clear intention to do so. The Interstate Commerce Commission has not considered this limited and incidental operation as one which it would regulate. Commercial Zones and Terminal Areas, 1949, 48 M.C.C. 418;

Status of Parmalee, 1953, 288 I.C.C. 95; Exchange of Free Transportation, 1907, 12 I.C.C. 39; Anacostia Citizens Ass'n v. B. & O., 1912, 25 I.C.C. 411; Michigan Cab Co., 1938, 7 M.C.C. 701; New York Dry Dock Ry. Co. v. Pennsylvania R. Co., 3 Cir., 1933, 62 F.2d 1010; Regulations 190.33 and 190.30 (49 C.P.R. §§ 190.33, 190.30)..

Admitting this disclaimer of exercise of paramount authority by the Interstate Commerce Commission, the plaintiffs nevertheless insist that § 28–1 and § 28–31 of the Municipal Ordinance contains a potential exercise of discretion to prohibit the "stream of interstate commerce" represented by the transportation of through passengers between railroad terminals and thus invades the exclusive power granted to Congress to regulate interstate commerce.

The pertinent section of the ordinance is § 28–31.1 and provides:

> "No license for any terminal vehicle shall be issued except in the annual renewal of such license or upon transfer to permit replacement of a vehicle for that license unless, after a public hearing held in the same manner as specified for hearings in Section 28–22.1, the Commissioner shall report to the Council that public convenience and necessity requires additional terminal vehicle service and shall recommend the number of such vehicle licenses which may be issued.

> "In determining whether public convenience and necessity require additional terminal vehicle service, due consideration shall be given to the following:

> "1. The public demand for such service;

> "2. The effect of an increase in the number of such vehicles on the safety of existing vehicular and pedestrian traffic in the area of their operation;

> "3. The effect of an increase in the number of such vehicles upon the ability of the licensee to continue rendering the required serv-

ice at reasonable fares and charges to provide revenue sufficient to pay for all costs of such service, including fair and equitable wages and compensation for licensee's employees and a fair return on the investment in property devoted to such service;

"4. Any other facts which the Commissioner may deem relevant.

"If the Commissioner shall report that public convenience and necessity require additional terminal vehicle service, the Council, by ordinance, may fix the maximum number of terminal vehicle licenses to be issued, not to exceed the number recommended by the Commissioner."

The precise issue presented is therefore —does the *power to forbid* the operation of Transfer as an incident of railroad transportation on the grounds of public convenience and necessity violate the commerce clause of the Constitution; and, does the discretion contained in said section constitute a burden on interstate commerce so as to render the ordinance invalid. It is apparent that the language of the above section does not prevent Transfer from performing its interstate commerce operation. Transfer has not applied for a permit or license as a terminal vehicle operator under the City's ordinance.

■ The powers of municipalities to control the use of their streets is stated in 64 C.J.S., Municipal Corporations, § 1760, p. 199, as follows:

"As a mere privilege, the use of streets by common carriers is subject to reasonable control and regulation, and, since such a right or privilege is special, unusual, and extraordinary, the power to regulate and restrict such use of the streets is broader than in respect of their use by the general public. The state or municipality, within the limits of its delegated powers, may determine to what extent or on what streets such an extraordinary use as encroaches on the paramount rights of the public at large will be permitted, and it may discriminate against those making such use of the streets, and may either grant or withhold the right or privilege of operating vehicles for such a purpose, and may grant it to some and refuse it to others, without violating the constitution, except that a license or permission cannot be granted to some and refused to others who are willing to comply with the terms and conditions of the regulation providing for such license or permission."

In Railway Express Agency v. New York, 1948, 336 U.S. 106, 111, 69 S.Ct. 463, 466, 93 L.Ed. 533, the Supreme Court stated:

"Where traffic control and the use of highways are involved and where there is no conflicting federal regulation, great leeway is allowed local authorities, even though the local regulation materially interferes with interstate commerce."

■ The legal philosophy expounded in Bush & Sons Co. v. Maloy, 1924, 267 U.S. 317, 45 S.Ct. 326, 69 L.Ed. 627 and Buck v. Kuykendall, 1924, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623, does not reject the principle that a provision for exercise of discretion is valid when properly authorized under the police power delegated. These cases support the proposition that the granting or refusing of a permit for interstate transportation over state highways is a proper exercise of state authority *provided* that it is not used to *control or burden interstate commerce.* This distinction was observed in Bradley v. Public Utilities Comm., 1932, 289 U.S. 92, 95, 53 S.Ct. 577, 578, 77 L.Ed. 1053:

"It is contended that an order denying to a common carrier by motor a certificate to engage in interstate transportation necessarily violates the Commerce Clause. The argument is that under the rule declared in Buck v. Kuykendall, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623, and Bush

& Sons Co. v. Maloy, 267 U.S. 317, 45 S.Ct. 326, 327, 69 L.Ed. 627, an interstate carrier is entitled to a certificate as of right; and that hence the reason for the commissioner's refusal and its purpose are immaterial. In those cases, safety was doubtless promoted when the certificate was denied, because intensification of traffic was thereby prevented. See Stephenson v. Binford, 287 U.S. 251, 269–272, 53 S.Ct. 181, 77 L.Ed. 288. But there promotion of safety was merely an incident of the denial. Its purpose was to prevent competition deemed undesirable. The test employed was the adequacy of existing transportation facilities; and since the transportation in question was interstate, denial of the certificate invaded the province of Congress. In the case at bar, the purpose of the denial was to promote safety; and the test employed was congestion of the highway. The effect of the denial upon interstate commerce was merely an incident."

 It is contended that the purpose of the ordinance was to favor Parmalee, to assure the continuance of Parmalee's operations, and thus to prevent the operation of Transfer in competition with Parmalee. If the legislation is within the power properly granted to municipal authorities, the courts of Illinois have held that in determining its validity, the motive which prompted its enactment is not a matter of concern and an ordinance will not be declared invalid because of motives which induced its passage. Murphy v. Chicago, R. I. & P. Ry. Co., 1910, 247 Ill. 614, 93 N.E. 381; Keig Stevens Baking Co. v. City of Savanna, 1942, 380 Ill. 303, 44 N.E.2d 23; Stearns v. City of Chicago, 1938, 368 Ill. 112, 13 N.E.2d 63, 114 A.L.R. 1507; City of Chicago v. Walters, 1936, 363 Ill. 125, 1 N.E.2d 396, affirmed Hauge v. City of Chicago, 299 U.S. 387, 57 S.Ct. 241, 81 L.Ed. 297; Tribune Co. v. Thompson, 1930, 342 Ill. 503, 174 N.E. 561; Moskal v. Catholic Bishop of Chicago, 1942, 315 Ill.App. 461, 43 N.E.2d 206.

 The above section of the ordinance does not grant the Commissioner and City Council an arbitrary right to refuse a terminal vehicle license. It is true it confers a discretionary power, but this condition is valid where the public health and safety are involved. In such instances courts are loath to interfere with legislative discretion and reluctant to declare such ordinances invalid. Tower Realty v. City of East Detroit, 6 Cir., 1952, 196 F.2d 710. The fact that discretion is lodged in an official or group of officials to grant or withhold a license does not entitle plaintiffs to complain until the license is arbitrarily or unlawfully withheld because

"* * * one who is within the terms of the statute, but has failed to make the required application, is not at liberty to complain because of his anticipation of improper or invalid action in administration." Smith v. Cahoon, 1931, 283 U.S. 553, 51 S.Ct. 582, 585, 75 L.Ed. 1264.

In Lehon v. City of Atlanta, 1916, 242 U.S. 53, 37 S.Ct. 70, 72, 61 L.Ed. 145, the Supreme Court stated:

"To complain of a ruling, one must be made the victim of it. One cannot invoke, to defeat a law, an apprehension of what might be done under it, and which, if done, might not receive judicial approval."

 The allegations of the verified complaint and all affidavits submitted by plaintiff are the basis for its application for injunctive relief. Fines, and even imprisonment, which might result from continued violations of the ordinance do not constitute irreparable injury. Such results could be avoided by obeying the ordinance. Even if there was doubt as to the constitutionality of a statute, a fear of multiplicity of suits, fines and impairment of business are not of themselves sufficient ground for equitable relief against the enforcement of such a statute. Dalton

Adding Machine Co. v. Commonwealth of Virginia, 1915, 236 U.S. 699, 35 S.Ct. 480, 59 L.Ed. 797; Starnes v. City of Milledgeville, D.C.Ga.1944, 56 F.Supp. 956; S. Buchsbaum & Co. v. Beman, D. C.Ill.1936, 14 F.Supp. 444, 445, 447.

■■■ The court concludes that the ordinance under consideration is not invalid as an attempt to regulate and control interstate commerce, but is the legitimate exercise of police power by the City of Chicago in the interest of the safety and convenience of the public. Bradley v. Pub. Utilities Comm., 1933, 289 U.S. 92, 53 S.Ct. 577, 77 L.Ed. 1053; Continental Baking Co. v. Woodring, 1932, 286 U.S. 352, 52 S.Ct. 595, 76 L.Ed. 1155; Stephenson v. Binford, 1934, 287 U.S. 251, 53 S.Ct. 181, 77 L.Ed. 288; Texport Carrier Corp. v. Smith, D.C.Tex. 1933, 8 F.Supp. 28; Wald Storage & Transfer v. Smith, D.C.Tex.1933, 4 F. Supp. 61, affirmed 290 U.S. 596, 54 S.Ct. 129, 78 L.Ed. 524.

Plaintiffs contend that the ordinance does not apply to them because (1) as public utilities they are excepted from its provisions, and (2) it was not the intention of the City Council in passing the amendment to include the service by Transfer as a "terminal vehicle" service.

Conceding that the plaintiff railroads are public utilities and as such beyond the control of the City of Chicago, is the operation of Transfer within the exemption?

The railroads assert that under § 3(4) and § 302(c) (2) of the Interstate Commerce Act, 49 U.S.C.A., Transfer's service is an integral part of their railroad operation which they are obliged to provide. Section 3(4) of the Act provides for the interchange of traffic as follows:

"All carriers subject to the provisions of this chapter shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines, and for the receiving, forwarding, and delivering of passengers or property to and from connecting lines; and shall not discriminate in their rates, fares, and charges between connecting lines, or unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper. * * * "

In Kentucky & I. Bridge Co. v. Louisville & N. R. Co., C.C.D.Ky., 1889, 37 F. 567, 628, 629, 2 L.R.A. 289, the court referred to Railroad Co. v. Railroad Co., 1 I.C.C.Rep. 94, in connection with a discussion on through tickets and quoted as follows:

"'* * * such tickets very evidently are a great convenience to travelers, and perhaps to connecting roads; but they are a part of the voluntary arrangements for business purposes, like joint tariffs, interchange of cars, and common use of depots. It being, therefore, under our statute, matter of mutual agreement, whether coupon or through tickets shall be sold by a railroad company over roads of other companies, it follows that the form of such tickets, and the manner of their sale, are also matters of agreement by the companies interested. If companies can agree upon their tariffs, the form of their tickets, and how they shall be sold, they have the right to do so, and by such agreement become interstate carriers; but if they cannot agree, the act does not undertake to coerce them to do business together upon terms that may be justly objectionable or injurious.' * * * No authority is conferred upon common carriers of interstate commerce to issue through tickets to passengers, or through bills of lading for property, at through rates, over connecting lines, in the absence of such arrangements between the companies. * * * "

Arrangements for through tickets and other incidences to their function as common carriers are left to the discre-

tion of the railroads. In these facets of their operations, it was stated in I. C. C. v. Baltimore & O. R. Co., C.C.D. Ohio, 1890, 43 F. 37, 50, 51 that

" * * * the act to regulate commerce leaves common carriers as they were at common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same principles which are recognized as sound, and adopted in other trades and pursuits."

■ This interchange of traffic between carriers is left to the voluntary action of the railroads involved and a railroad is not under a compulsion or duty to provide such facilities in the absence of Commission action requiring it in the public interest. Southern Pac. Co. v. I. C. C., 1905, 200 U.S. 536, 553, 26 S. Ct. 330, 50 L.Ed. 585; and other cases cited under § 3(4). The character of the service provided for by Transfer is incidental to railroad operation and is analogous to contracts by railroads for heat, light and power for their terminal stations. The service of Transfer does not constitute an operation as a public utility and its motor vehicles are not, therefore, excluded from the operation of the ordinance.

Plaintiffs contend that the particular service provided by Transfer was not intended to be included within the scope of the Public Passenger Vehicle ordinance and particularly § 28–1 thereof. The reasons urged in support of this argument are: (1) that if it is applicable, then the City Council deliberately disregarded the relation of such service to through railroad transportation of which it is an integral part; and (2) that the amendments to the ordinance after June 16, 1945 to the present and changes in the qualifications and definitions of "public passenger vehicle" and "terminal vehicle" show an intention to exclude Transfer's service.

If the conclusion that the City Council deliberately disregarded the relationship of Transfer's service to the railroads is sound, it emphasizes the Council's intent to include its operation.

With respect to plaintiffs' conclusion that prior to 1950 this type of service was excepted as being a public utility operation, references to earlier definitions of "public passenger vehicle" are of no assistance because of the difference in language contained in the present ordinance. The court has determined that Transfer's service is not excepted as a public utility operation.

■ The last point urged by plaintiffs is that the ordinance did not intend to include Transfer's operation in the definition of a "terminal vehicle" as a public passenger vehicle because Transfer's services are exclusively devoted to interstation transportation. Regardless of whether this exclusive service was covered by previous ordinances, the language of the present ordinance is clear and unambiguous. It provides in § 28–1 that

" 'Terminal vehicle' means a public passenger vehicle which is operated exclusively for the transportation of passengers from railroad terminal stations and steamship docks to points within the area defined in Section 28–31."

Section 28–1 contains no qualifying or limiting language from which the court can conclude that the service by Transfer's vehicles was not encompassed within its scope. All the railroad terminals which Transfer serves are within the geographical area defined. The legislative history and background surrounding the passage of amended § 28–1 has been considered. The exhibits show discussion as to whether only interstation transportation was intended to be covered or whether all transportation from railroad stations within the designated area was to be included. These exhibits fail to indicate an intention to except interstation transportation of coupon holders by Transfer's vehicles.

In summary, the court holds the Public Passenger Vehicle ordinance, as amended July 26, 1955, to be a proper exercise of the City's police power and that the services of Transfer are within the ambit of its application.

The plaintiffs' motion for temporary injunction is denied, and the motion of the City of Chicago for summary judgment is sustained. Counsel are requested to present appropriate Findings of Fact, Conclusions of Law and Judgment Order within three (3) days from date hereof.

### Supplemental Memorandum

The court has considered the objections and exceptions to the defendants' proposed Findings of Fact, Conclusions of Law, and Order for Summary Declaratory Judgment and also plaintiffs' suggested Findings of Fact as well as the numerous criticisms of the court's memorandum.

Plaintiffs urge that the court's failure to refer and consider § 1(4) of the Interstate Commerce Act and also § 15 (3) thereof render its decision void. The court's memorandum cites certain statutory sections as follows: "§ 1(3), § 4, § 3(4)". The inclusion of § 4 stems from a typographical error and it is corrected to refer to the proper section; that is § 1(4).

From this error counsel for plaintiffs contend that the court erroneously relied upon cases, cited on pages 12–13 of its memorandum [136 F.Supp. 484, 485], which do not reflect the statutory obligation of carriers with respect to through routes and therefore its conclusion on the character of public utility operations and, in fact, the entire decision is without basis in law.

Concededly, neither § 1(4) nor § 15 (3) were a part of the Interstate Commerce Act when the cited cases were determined. Section 1(4) by its terms imposes a "duty" upon railroads to furnish transportation upon reasonable request and to establish reasonable through routes with other carriers. Section 15(3), in general, grants to the Interstate Commerce Commission the power to establish through routes when it shall find, after hearings, that such routes are necessary in the public interest. The cases cited, and decided before 1906, indicate that railroads could not be compelled to establish through routes. By § 15(3) authority is vested in the Interstate Commerce Commission to compel the establishment of through routes. Counsel conclude that insofar as these earlier cases show no statutory "duty" or compulsion upon carriers to establish through routes, they are inapplicable; that under § 1(4) carriers are required to make such arrangements; that these arrangements are no longer dependent upon voluntary negotiations between the carriers, but that § 1(4) compels a carrier, without order of the Commission, to establish such through routes. In Thompson v. United States, 1951, 343 U.S. 549, 555, 72 S.Ct. 978, 981, 96 L.Ed. 1134, the Supreme Court of the United States stated as follows:

"Under the Interstate Commerce Act, a carrier must not only provide transportation service at reasonable rates over its own lines but has the additional duty 'to establish reasonable through routes with such other carriers, and just and reasonable rates * * * applicable thereto'. Through routes may be and ordinarily are, established by the voluntary action of connecting carriers. Since 1906, through routes may also be established by the order of the Interstate Commerce Commission. * * *"

Thus, the "duty" contained in § 1(4) to establish through routes is usually exemplified, and continues to be the subject of voluntary action between the railroads as are the arrangements in the case at bar. Through routes are still matters created by voluntary action of the carriers, but since 1906 the Interstate Commerce Commission has the power under § 15(3) to compel such action where public necessity requires it.

Plaintiffs contend this "duty" under § 1(4) extends to providing interstation

transfer for through passengers as an integral and essential part of the reasonable facilities for through routes. The tariff filed as an exhibit shows that not all railroads with through routes have arranged for interstation transfer of through passengers. The Interstate Commerce Commission noted this fact in Status of Parmalee, 1953, 288 I.C.C. 95, as follows:

"A survey made by the respondent disclosed that there are approximately 400 points in the United States where passengers and their baggage are transferred between stations by local transfer companies for railroads. * * * There are numerous points, throughout the country, however, where the railroads have not assumed the responsibility for providing free transfer service and no such arrangements are maintained by them at those points. Although through tickets by way of those points are sold by the railroads, passengers traveling over such routes are required, by appropriate tariff provisions, to make their own transfer arrangements."

Interstation transfer arrangements in Chicago have been established voluntarily for business purposes in order to meet the competition of through routes over railroads operating out of common terminals. The court is of the opinion § 1(4) relating to through routes and § 3(4) relating to reasonable facilities for the interchange of traffic do not require the railroads to provide the transfer service between railroad terminals.

A further correction should be made with reference to the evidence considered on the motion for injunction to include reference to and consideration of the affidavits filed by the plaintiffs. The first sentence in paragraph [20] of the memorandum is deleted and corrected to read as follows:

"The allegations of the verified complaint and all affidavits submit-

ted by plaintiff are the basis for its application for injunctive relief."

In all other respects the court adheres to its memorandum of December 12, 1955 as filed.